650 S.E.2d 169

**STATE of West Virginia, Appellee,**

v.

**Eddie MULLENS, Appellant.**

**No. 33073.**

Supreme Court of Appeals of West Virginia.

Submitted Nov. 14, 2006.

Decided Feb. 28, 2007.

Dissenting Opinion of Justice Benjamin April 13, 2007.

yer, the allegations of the formal charge must be proved by clear and convincing evidence.")

Benjamin M. Conaway, Conaway & Conaway, Madison, for Appellant.

1. This sentence was suspended, and Mr. Mullens was placed on two years probation.

2. The parameters of a conditional plea are outlined in Rule 11(a)(2) of the West Virginia Rules of Criminal Procedure as follows:

 Conditional Pleas. With the approval of the court and the consent of the state, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right, on appeal from the judgment, to review of the adverse determination of any specified pretrial motion. A defendant who prevails on appeal shall be allowed to withdraw the plea.

Darrell V. McGraw, Jr., Attorney General, Barry L. Koerber, Assistant Attorney General, Charleston, for Appellee.

DAVIS, Chief Justice:

Eddie Mullens (hereinafter "Mr. Mullens") appeals an order of the Circuit Court of Boone County sentencing him to a term of one to five years imprisonment,[1] after entering a conditional guilty plea to a charge of delivery of a controlled substance.[2] Pursuant to the terms of the conditional guilty plea, Mr. Mullens assigns error to the circuit court's denial of his motion to suppress an audio and video recording of the drug transaction that occurred in his home. Mr. Mullens asserts that the audio and video recording should have been suppressed because the evidence was obtained by an informant acting under the color of law *without* a court order. After careful consideration of the briefs, record and oral arguments, we find that the circuit court should have suppressed the audio and video recording in this case. Accordingly, Mr. Mullens' conviction and sentence are reversed, and this case is remanded to permit him to withdraw his guilty plea.

## I.

## FACTUAL AND PROCEDURAL HISTORY

On December 11, 2003, law enforcement agents with the U.S. 119 Drug and Violent Crimes Task Force (hereinafter "Task Force")[3] employed a confidential informant to make an illegal drug purchase at Mr. Mullens' home.[4] The Task Force equipped the confidential informant with a hidden audio and video recording device.[5] The Task

See also State v. Lilly, 194 W.Va. 595, 461 S.E.2d 101 (1995) (Cleckley, J., concurring) (discussing conditional pleas).

3. The Task Force was led by Deputy Sheriff Chad Barker.

4. For security reasons, the record does not disclose the identity of the confidential informant.

5. This "electronic surveillance device [is] commonly referred to as a body wire[.]" State v. Dillon, 191 W.Va. 648, 652, 447 S.E.2d 583, 587 (1994).

Force did not obtain judicial authorization to allow the confidential informant to use the electronic surveillance device while inside Mr. Mullens' home.

On the evening of December 11, the confidential informant went to Mr. Mullens' home. The confidential informant was invited into the home by Mr. Mullens and his wife, Jessica Mullens. Once inside the home, the confidential informant purchased 3.23 grams of marijuana. The electronic surveillance device worn by the confidential informant recorded the drug purchase.

On September 22, 2004, a grand jury returned an indictment against Mr. Mullens and his wife, charging them with one count of delivery of a controlled substance and one count of conspiring to deliver a controlled substance.[6] Mr. Mullens filed a motion to suppress the audio and video recording of the drug transaction asserting that the federal and state constitutions and state electronic surveillance laws required judicial authorization for the confidential informant to enter his home with the electronic surveillance device. After holding a hearing on the motion, the circuit court entered an order on November 16, 2005, denying the motion to suppress. The circuit court's ruling was based upon the United States Supreme Court's decision in *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971).

As a consequence of the circuit court's denial of the motion to suppress, Mr. Mullens entered a plea agreement with the State. Under that agreement, Mr. Mullens pled guilty to the charge of delivery of a controlled substance, upon the condition that he be allowed to appeal the denial of his motion to suppress. By order entered November 30, 2005, the circuit court accepted the plea agreement and sentenced Mr. Mullens to a term of 1 to 5 years imprisonment.[7] From this ruling, Mr. Mullens now appeals.

## II.

### STANDARD OF REVIEW

We have been called upon to decide whether the circuit court committed error in denying Mr. Mullens' motion to suppress evidence obtained through the use of an electronic surveillance device. In examining a challenge to a circuit court's ruling in a suppression hearing, we are guided by the following standard of review:

> On appeal, legal conclusions made with regard to suppression determinations are reviewed de novo. Factual determinations upon which these legal conclusions are based are reviewed under the clearly erroneous standard. In addition, factual findings based, at least in part, on determinations of witness credibility are accorded great deference.

Syl. pt. 3, *State v. Stuart*, 192 W.Va. 428, 452 S.E.2d 886 (1994). Insofar as the circuit court's ruling on the suppression motion involved purely legal determinations, we review the circuit court's order de novo.

## III.

### DISCUSSION

The instant appeal requires us to decide whether the police can, without prior impartial judicial authorization, solicit a person to serve as a confidential informant, equip that person with an electronic surveillance device and send him/her into the home of any citizen the police arbitrarily decide to investigate. The impact of this Court's resolution of the issue herein presented reaches literally into the home of every citizen of our State. The immense import of our ruling in this case demands that we leave no stone unturned and no footnote unread in reaching our decision. For this reason our analysis will proceed with an examination of (1) federal electronic surveillance laws, (2) electronic surveillance laws of other states, and (3) West Virginia's electronic surveillance laws.

### A. An Informant's Use of an Electronic Surveillance Device in the Home of Another under Federal Laws

In Mr. Mullens' motion to suppress he argued that the prohibition of unlawful

---

6. The record does not disclose any information about the disposition of the case against Mr. Mullens' wife.

7. As previously indicated, the sentence was suspended, and Mr. Mullens was placed on probation.

search and seizure, under the Fourth Amendment to the federal constitution, was violated by the failure of the police to obtain judicial authorization to have an informant enter his home wearing an audio and video recording device. The circuit court found that, based upon the decision of the United States Supreme Court in *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), the Fourth Amendment was not violated. Before we discuss *White*, we must first examine the federal electronic surveillance statutes.

**1. Federal electronic surveillance under Title III.** Under federal law, the use of electronic surveillance devices by law enforcement officials was initially governed by general provisions contained in the Federal Communications Act of 1934.[8] However, in 1968 Congress enacted detailed electronic surveillance laws through Title III of the Omnibus Crime Control and Safe Streets Act.[9] Title III "sets forth comprehensive standards governing the use of ... electronic surveillance by both governmental and private agents." *Mitchell v. Forsyth*, 472 U.S. 511, 515, 105 S.Ct. 2806, 2809, 86 L.Ed.2d 411, 418 (1985). In 1986, Congress amended Title III through enactment of the Electronic Communications Privacy Act (hereinafter "ECPA"),[10] in an effort to reflect technologi-

cal advancements in the area of electronic surveillance. *See Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1320 (11th Cir.2006) ("The ECPA was enacted to update the then existing federal wiretapping law to protect the privacy of the growing number of electronic communications.").[11] Title III was further amended by the Communications Assistance for Law Enforcement Act of 1994.[12]

It has been suggested that the long history of federal law in the area of electronic surveillance devices reveals attempts by Congress "to assist law enforcement in the investigation and prosecution of organized crime and to protect the privacy rights of United States citizens against the unwarranted interception of...communications[.]" Daniel R. Dinger, *Should Parents Be Allowed to Record a Child's Telephone Conversations When They Believe the Child Is in Danger?: An Examination of the Federal Wiretap Statute and the Doctrine of Vicarious Consent in the Context of a Criminal Prosecution*, 28 Seattle U.L.Rev. 955, 958 (2005). "In short, Title III represents an attempt by Congress to establish a system of electronic surveillance subject to rigorous safeguards." *United States v. Clemente*, 482 F.Supp. 102, 106 (S.D.N.Y.1979).

---

**8.** The relevant provision of the Federal Communications Act is found at 47 U.S.C.A. § 605 (2001). This statute prohibits the unauthorized interception of wire, radio or satellite delivered programs.

**9.** Title III regulates both wiretapping and electronic surveillance. So as not to confuse matters, our use of the term "electronic surveillance" includes wiretapping and all other forms of surveillance.

**10.** The Electronic Communications Privacy Act is codified as amended at 18 U.S.C.A § 3121, *et seq.* This Act establishes standards for intercepting telephone numbers through the use of pen registers and trap and trace devices.

The ECPA had a second component called the Stored Communications Act. This Act established punishments for the unauthorized accessing of a wire or electronic communication that is in electronic storage. *See* 18 U.S.C.A § 2701, *et seq.*

**11.** *See also Brown v. Waddell*, 50 F.3d 285, 289 (4th Cir.1995) ("The principal purpose of the ECPA amendments to Title III was to extend to

'electronic communications' the same protections against unauthorized interceptions that Title III had been providing for 'oral' and 'wire' communications via common carrier transmissions. This extension was found necessary by Congress because of 'dramatic changes in new computer and telecommunications technologies' that had created new risks to 'privacy and security of communications transmitted by new non-common carrier communication services or new forms of telecommunications and computer technology.' These had not been covered by Title III's protection of 'voice communications transmitted via common carrier,' and the ECPA amendments were designed to remedy that newly-developed gap in coverage.").

**12.** This Act "requires telecommunications carriers to ensure that their systems are technically capable of enabling law enforcement agencies operating with proper legal authority to intercept individual telephone calls and to obtain certain 'call-identifying information.'" *United States Telecom Ass'n v. Federal Communications Comm'n*, 227 F.3d 450, 453 (D.C.Cir.2000). The Act is codified at 47 U.S.C.A. § 1001, *et seq.* (2001).

The pertinent federal electronic surveillance provisions of Title III are codified at 18 U.S.C.A. § 2510, *et seq.* These statutes "represent[ ] an attempt to strike what is clearly a balance through stringent regulation of the uses of electronic surveillance in order to achieve the dual purpose of protecting individual privacy, while permitting limited government surveillance in accordance with uniform standards." *Application of the U.S. Authorizing the Interception of Wire Communications,* 413 F.Supp. 1321, 1331 (E.D.Pa.1976). Except for specifically codified exceptions, Title III prohibits the unauthorized use of a device to record another's communication.[13] Title III requires judicial authorization, except in limited circumstances, for recording the communications of another with an electronic surveillance device.[14] Under Title III, criminal and civil penalties are imposed for the unauthorized use of a device to record the communication of another person.[15] Title III also contains an evidentiary suppression remedy that provides for the suppression of unlawfully intercepted communications.[16]

One of the exceptions to the prohibition on unauthorized electronic surveillance is found in 18 U.S.C.A. § 2511(2)(c). This statute provides:

> (c) It shall not be unlawful under this chapter for *a person acting under color of law* to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

(Emphasis added).[17]

Under this statute, "consent of one party to a conversation is sufficient to permit a person acting under color of law to [lawfully] intercept a wire, oral, or electronic communication." *United States v. Pratt,* 913 F.2d 982, 986 (1st Cir.1990) (internal quotations omitted). Federal "[c]ourts have established that informants who record private conversations at the direction of government investigators are 'acting under color of law.'" *United States v. Haimowitz,* 725 F.2d 1561, 1582 (11th Cir.1984) (citations omitted).

For the purposes of this case, it is clear that there is statutory authority for federal

---

**13.** The prohibitions under Title III are contained in 18 U.S.C.A. § 2511(1) as follows:

(1) Except as otherwise specifically provided in this chapter any person who-

(a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;

(b) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication . . .;

(c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

(d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; or

(e) (I) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, intercepted by means authorized by sections 2511(2)(a)(ii), 2511(2)(b)-(c), 2511(2)(e), 2516, and 2518 of this chapter, (ii) knowing or hav-

ing reason to know that the information was obtained through the interception of such a communication in connection with a criminal investigation, (iii) having obtained or received the information in connection with a criminal investigation, and (iv) with intent to improperly obstruct, impede, or interfere with a duly authorized criminal investigation, shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

**14.** *See* 18 U.S.C.A. §§ 2516 and 2518.

**15.** *See* 18 U.S.C.A. § 2511(4) and (5).

**16.** *See* 18 U.S.C.A. §§ 2515 and 2518(10).

**17.** Another exception is set out under 18 U.S.C.A. § 2511(2)(d) as follows:

(d) It shall not be unlawful under this chapter for *a person not acting under color of law* to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

(Emphasis added).

officials to place an electronic surveillance device on a consenting informant, without judicial authorization, for the purpose of recording communications with a third-party suspect. The issue of whether or not the use of an informant in this manner, while in the home of a suspect, violates the Fourth Amendment was addressed in the *White* decision.

### 2. *United States v. White* and the Fourth Amendment.

The case of *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), involved a defendant who was prosecuted by the federal government for drug trafficking. Prior to the defendant's arrest, federal authorities arranged to have a confidential informant wear a listening device during meetings with the defendant. Federal officials did not obtain judicial authorization to equip the informant with an electronic surveillance device. As a result of the informant wearing the electronic surveillance device, federal authorities were able to hear conversations between the defendant and the informant during eight separate meetings-only one of which was in the actual home of the defendant. During the defendant's trial, the government introduced evidence of the statements made by the defendant to the informant.[18] The defendant was ultimately convicted. The Court of Appeals for the Seventh Circuit reversed the conviction, concluding that evidence of statements made by the defendant to the informant should have been suppressed, because the evidence was obtained without a warrant in violation of the Fourth Amendment.[19]

In a six to three decision, the United States Supreme Court reversed the decision of the Court of Appeals. Thus, the judgment in *White* was rendered in a plurality opinion.[20] The plurality opinion justified the Court's judgment as follows:

No warrant to "search and seize" is required ... when the Government sends to defendant's home a secret agent who conceals his identity and makes a purchase of narcotics from the accused, or when the same agent, unbeknown to the defendant, carries electronic equipment to record the defendant's words and the evidence so gathered is later offered in evidence.

. . . .

Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise violating the latter's Fourth Amendment rights. For constitutional purposes, no different result is required if the agent instead of immediately reporting and transcribing his conversations with defendant, either (1) simultaneously records them with electronic equipment which he is carrying on his person; (2) or carries radio equipment which simultaneously transmits the conversations either to recording equipment located elsewhere or to other agents monitoring the transmitting frequency. If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks.

*White*, 401 U.S. at 749–51, 91 S.Ct. at 1125–26, 28 L.Ed.2d at 457–58 (internal citations omitted).

The decision in *White* stands for the proposition that a person does not have an expectation of privacy regarding conversations

---

**18.** The informant did not testify during the trial. The statements made by the defendant to the informant were testified to by officers who were listening in on the conversations.

**19.** The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

**20.** The plurality opinion was written by Justice White, in which Chief Justice Burger and Justices Stewart and Blackmun joined.

held in his/her home with a third party. Without such an expectation of privacy, under *White* the Fourth Amendment does not require the police to obtain judicial authorization to send an informant wearing an electronic surveillance device into the home of another person. *See also United States v. Eschweiler*, 745 F.2d 435 (7th Cir.1984), (holding that informant's use of electronic surveillance device in defendant's home did not violate the Fourth Amendment); *United States v. Hankins*, 195 Fed.Appx. 295 (6th Cir.2006) (same); *United States v. Brathwaite*, 458 F.3d 376 (5th Cir.2006) (same); *United States v. Davis*, 326 F.3d 361 (2nd Cir.2003)(same).

Three Justices dissented from the majority's judgment in *White*. All three Justices believed that the Fourth Amendment required federal officials to obtain a warrant before attaching an electronic surveillance device to an informant, for the purpose of capturing conversations with a suspect, regardless of where the conversations were held. The position taken by the dissenters was articulated best in the dissenting opinion of Justice Harlan. In his dissent, Justice Harlan made the following observations:

> The impact of the practice of third-party bugging, must, I think, be considered such as to undermine that confidence and sense of security in dealing with one another that is characteristic of individual relationships between citizens in a free society. . . . The argument of the plurality opinion, to the effect that it is irrelevant whether secrets are revealed by the mere tattletale or the transistor, ignores the differences occasioned by third-party monitoring and recording which insures full and accurate disclosure of all that is said, free of the possibility of error and oversight that inheres in human reporting.

> Authority is hardly required to support the proposition that words would be measured a good deal more carefully and communication inhibited if one suspected his conversations were being transmitted and transcribed. Were third-party bugging a prevalent practice, it might well smother that spontaneity—reflected in frivolous, impetuous, sacrilegious, and defiant discourse—that liberates daily life. Much offhand exchange is easily forgotten and one may count on the obscurity of his remarks, protected by the very fact of a limited audience, and the likelihood that the listener will either overlook or forget what is said, as well as the listener's inability to reformulate a conversation without having to contend with a documented record. All these values are sacrificed by a rule of law that permits official monitoring of private discourse limited only by the need to locate a willing assistant.

> . . . .

> Finally, it is too easy to forget—and, hence, too often forgotten-that the issue here is whether to interpose a search warrant procedure between law enforcement agencies engaging in electronic eavesdropping and the public generally. By casting its "risk analysis" solely in terms of the expectations and risks that "wrongdoers" or "one contemplating illegal activities" ought to bear, the plurality opinion, I think, misses the mark entirely. . . . The very purpose of interposing the Fourth Amendment warrant requirement is to redistribute the privacy risks throughout society in a way that . . . would prevent public officials from engaging in that [third-party bugging] practice unless they first had probable cause to suspect an individual of involvement in illegal activities and had tested their version of the facts before a detached judicial officer. The interest [the majority] fails to protect is the expectation of the ordinary citizen, who has never engaged in illegal conduct in his life, that he may carry on his private discourse freely, openly, and spontaneously without measuring his every word against the connotations it might carry when instantaneously heard by others unknown to him and unfamiliar with his situation or analyzed in a cold, formal record played days, months, or years after the conversation. Interposition of a warrant requirement is designed not to shield "wrongdoers," but to secure a measure of privacy and a sense of personal security throughout our society.

> The Fourth Amendment does, of course, leave room for the employment of modern technology in criminal law enforcement,

but in the stream of current developments in Fourth Amendment law I think it must be held that third-party electronic monitoring, subject only to the self-restraint of law enforcement officials, has no place in our society.

*White,* 401 U.S. at 787–91, 91 S.Ct. at 1143–45, 28 L.Ed.2d at 478–80 (Harlan, J., dissenting) (internal citations omitted).

In addition to the dissenters in *White,* scholars have argued that the Fourth Amendment should require a warrant to be issued before the police send an informant into a suspect's home while wearing an electronic surveillance device. The following is a cursory review of the criticisms of *White* by some scholars:

Justice Harlan's dissent in *United States v. White* warned against unsupervised use of government power to spy on the people. He urged that electronic and false-friend surveillance ... be permitted only under the warrant requirements of the Fourth Amendment, so that government intrusion is possible only if a magistrate agrees with the government that there is probable cause. Respect for the principles that underlie the Fourth Amendment and the rebellion that produced it, demands no less. ... By declaring that one has no reasonable expectation of privacy when speaking with another, the Court removes conversation from the protections of the Fourth Amendment, leaving government power unchecked. The Amendment becomes an empty, and mocking, promise. The Court has thus abdicated the judicial function in an area so sensitive that it lay at the heart of the revolution.

Donald L. Doernberg, *"Can You Hear Me Now?": Expectations of Privacy, False Friends, and the Perils of Speaking under the Supreme Court's Fourth Amendment Jurisprudence,* 39 Ind. L.Rev. 253, 306–08 (2006).

Unless the *White* plurality truly is willing to saddle American society with the universal risk that every conversation may be electronically monitored, then the *White* plurality view is not only illogical and unreasonable—it is absurd. Moreover, it defies common sense as well as the common understanding of Americans who yet have some sensitivity to the "qualitative difference" between electronic surveillance and conventional police investigation.

Mona R. Shokrai, *Double–Trouble: The Underregulation of Surreptitious Video Surveillance in Conjunction with the Use of Snitches in Domestic Government Investigations,* 13 Rich. J.L. & Tech. 3, 58 (2006)(quoting Tom P. Conom, *Privacy and the Fourth Amendment in the Twenty–First Century,* 19 CHAMPION 13, 18 (1995)).

The *White* plurality, without any discussion or analysis of the doctrinal shift announced in [*Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ] reaffirmed prior holdings that authorized unchecked surveillance of private conversations and unbridled invasions of private homes and offices whenever informants are available to gather information for the government. If the "Fourth Amendment protects people, and not places," as *Katz* insisted, then why is the Amendment inapplicable against government efforts to record conversations or infiltrate homes or offices using secret informants? If the Fourth Amendment restrains the discretion of the police to wiretap or "bug" private conversations (conducted in telephone booths), it is not apparent why that same provision is inapplicable when the police monitor and record private conversations through the use of a secret informant deliberately position(ed) to hear those conversations. After all, a secret informant acts as a "human bug" for the government.

Tracey Maclin, *Katz, Kyllo, and Technology: Virtual Fourth Amendment Protection in the Twenty-first Century,* 72 Miss. L.J. 51, 76 (2002).

It cannot be denied that one risks public revelation of private thoughts any time one takes on a confidante. Once again, however, the Court's assumption of the risk/implied consent analysis takes on an air of fantasy.... The Court's analysis in its undercover cases is based on a dangerous premise: that we should expect no privacy from the government when we do not expect it from others. If this premise were taken seriously, the only sphere of privacy

still protected from unnecessary government intrusion would be what we kept to ourselves....

Furthermore, undercover activity is more likely than other types of searches to occasion prolonged insinuation into people's privacy. In the typical search and seizure scenario, the target can minimize the intrusion by consenting to particular actions or proving his or her innocence in some way. When the government proceeds covertly, however, these options are not available. Added to this denigration of individual interests is the damage undercover police work causes to the democratic state's objective of remaining legitimate. First, because it relies on fraud and deceit, covert investigation undermines trust in the government. More importantly, it increases distrust of everyone, since anyone could be a government agent....

... Thus, undercover activity undercuts both the state's interest in maintaining the allegiance of its citizenry and its objective of nurturing an open, democratic society. Because of these possible effects, one might argue that undercover activity should be banned.... At the least, judicial authorization should be obtained prior to any nonexigent undercover activity....

Christopher Slobogin, *The World Without a Fourth Amendment*, 39 UCLA L.Rev. 1, 103–05 (1991). *See also* Tracey Maclin, *Informants and the Fourth Amendment: A Reconsideration*, 74 Wash. U.L.Q. 573, 617 (1996) ("[W]hen I open my front door to a friend, to an overnight delivery worker, or to a complete stranger, access is afforded only to those whom I knowingly admit. If the police want access to my home, they should follow lawful procedure. At times, stealthy entries may be necessary; but under the

Constitution, the police cannot decide by themselves when they will enter a home.").

Notwithstanding the criticisms of *White*, the decision remains the law for Fourth Amendment purposes. Thus, insofar as the circuit court found that the Fourth Amendment was not violated by the conduct of the police in this case, that ruling was correct.

### B. An Informant's Use of an Electronic Surveillance Device in the Home of Another under the Laws of Other States

■ Pursuant to Title III, 18 U.S.C.A. § 2516(2), states are authorized "to adopt coordinate statutes permitting the interception of wire, oral, or electronic communications, and to grant greater, but not lesser, protection than that available under federal law." *Commonwealth v. Spangler*, 570 Pa. 226, 231–32, 809 A.2d 234 (2002). *See also Bishop v. State*, 241 Ga.App. 517, 526 S.E.2d 917 (1999); *Commonwealth v. Barboza*, 54 Mass.App.Ct. 99, 763 N.E.2d 547 (Mass. 2002).[21] A majority of jurisdictions have followed the federal government and enacted electronic surveillance statutes patterned after Title III. The discussion of electronic surveillance laws of other states will proceed in two parts: (1) states that do not have Title III type electronic surveillance statutes, and (2) states with Title III type electronic surveillance statutes.

1. **States that do not have Title III type electronic surveillance statutes.** There are five states that have not adopted Title III type electronic surveillance statutes: Alabama, Kentucky, Michigan, Montana and Vermont. Except for Vermont, all of these states have criminal eavesdropping statutes that generally prohibit the use of electronic

---

21. In the leading treatise on electronic surveillance laws the following was said regarding the interplay of Title III and state laws:

> The legislative history of Title III clearly indicates that Congress intended to permit state electronic surveillance laws to be more restrictive than the federal provisions, and therefore more protective of individual privacy. State surveillance statutes cannot, however, be less restrictive than Title III; nor can they expand the opportunities to conduct surveillance beyond those provided by Title III.

> ....

> ... Furthermore, a state court may construe the procedural requirements of its electronic surveillance law more strictly than federal courts, thereby giving added meaning to the state's constitutional or statutory guarantee of privacy.

James G. Carr, *The Law of Electronic Surveillance*, § 2.4(a) (2002).

surveillance devices.[22] Each state having such criminal statutes provides for exceptions. Alabama's criminal statute permits the police to use a consenting informant to record communications with a suspect. *See Spangler v. State*, 711 So.2d 1125 (Ala.Crim. App.1997); Ala. Stat. § 13A–11–30(1) (2005). Kentucky's statute also permits the police to use an informant to record communications with a suspect. *See Carrier v. Commonwealth*, 607 S.W.2d 115 (Ky.Ct.App.1980); Ky.Rev.Stat. § 526.010 (1999). Further, Michigan's criminal eavesdropping laws have been interpreted as permitting the police to use an informant to record conversations with a suspect. *See People v. Collins*, 438 Mich. 8, 475 N.W.2d 684 (1991); Mich. Comp. L. § 750.539g(a) (2003). Additionally, Montana's criminal eavesdropping laws permit the police to use an informant to record conversations with a suspect. *See State v. Brown*, 232 Mont. 1, 755 P.2d 1364 (1988); Mont.Code § 45–8–213(1)(c)(I) (2005).

Our research did not uncover any case in Alabama, Kentucky or Montana which addressed the issue of using an informant to enter a suspect's home while the informant was equipped with an electronic surveillance device. However, the Michigan Supreme Court in *People v. Beavers*, 393 Mich. 554, 227 N.W.2d 511 (1975), has held that the state constitution required a warrant to be issued before the police could send an informant equipped with an electronic surveillance device into the home of a suspect. The decision in *Beavers*, however, was overruled by *People v. Collins*, 438 Mich. 8, 475 N.W.2d 684 (1991), a case which did not involve communications in a suspect's home.[23]

As previously indicated, Vermont does not appear to have any statutory laws addressing the issue of using electronic surveillance devices. This issue appears to be guided solely by the search and seizure provision of the state's constitution. In spite of the absence of any statutory law, the issue of using an informant equipped with an electronic sur-

veillance device to enter the home of a suspect, without a warrant, has been addressed by the Supreme Court of Vermont.

In *State v. Blow*, 157 Vt. 513, 602 A.2d 552 (1991), the police used an informant to record a drug transaction in the home of the defendant. During the trial, a police officer was permitted to testify about the contents of the electronically recorded drug transaction. The defendant was convicted. In his appeal, the defendant argued that the electronic surveillance evidence should have been suppressed because it was obtained without a search warrant as required by the search and seizure provision of the Vermont Constitution. The Supreme Court of Vermont agreed with the defendant and reversed the conviction. The opinion in *Blow* reasoned as follows:

> In assessing the constitutionality of technologically enhanced government surveillance in a particular case, we must identify the values that are at risk, and vest the reasonable-expectation-of-privacy test with those values. In the instant case, defendant's conversation with the informant took place in defendant's home, and there is no indication in the record to suggest that he expected the conversations to be transmitted beyond the immediate environs, especially not through electronic enhancement. Clearly, he did not "knowingly expose" the conversation to the outside world, and therefore exhibited a clear subjective expectation of privacy. The objective component of the . . . test was met as well. We have stated that the reasonableness analysis must be tied to identifiable constitutional values. One such value under [the state constitution] concerns the deeply-rooted legal and societal principle that the coveted privacy of the home should be especially protected. [F]reedom of speech is undermined where people fear to speak unconstrainedly in what they suppose to be the privacy of home and office.

---

**22.** The statutes in these states do not provide the elaborate procedures of Title III for authorizing electronic surveillance by judicial officers. In these states, the police must utilize general search warrant laws in order to engage in electronic surveillance.

**23.** It must be assumed that *Collins* would permit the police to send an informant into the home of a suspect, without judicial authorization, while the informant was equipped with an electronic surveillance device.

. . . .

We conclude that warrantless electronic participant monitoring conducted in a home offends the core values of [our constitution]. Accordingly, where the State uses an agent to enter a home for the purposes of eliciting and electronically transmitting evidence from an occupant of the home, it is the burden of the State to obtain a warrant upon probable cause prior to conducting that search.

*Blow,* 602 A.2d at 555–56 (citations and internal quotations omitted). *See also State v. Geraw,* 173 Vt. 350, 795 A.2d 1219 (2002)(holding that a police officer working undercover cannot enter a defendant's home with an electronic surveillance device without a search warrant).

**2. States with Title III type electronic surveillance statutes.** As previously stated, a majority of jurisdictions have electronic surveillance statutes patterned after Title III.[24] These statutes, like Title III, generally prohibit electronic surveillance in the absence of judicial authorization. However, while most of these jurisdictions follow Title III and statutorily recognize one-party consent to electronic surveillance, some jurisdictions do not. For this reason our discussion in this section will be divided into two parts: (a) states with Title III type one-party consent statutes, and (b) states without Title III type one-party consent statutes.

*(a) States with Title III type one-party consent statutes.* A total of 32 jurisdictions follow Title III by statutorily authorizing one-party consent to electronic surveillance. That is, under the statutes of these jurisdictions, the police do not need judicial authorization to conduct electronic surveillance if one party to the communication consents to the recording.[25]

24. *See* Alaska Stat. § 12.37.010, *et seq.* (2006); Ariz.Rev.Stat. § 13–3001, *et seq.* (2001); Ark. Code § 5–60–120 (2005); Cal.Penal Code § 629.50, *et seq.* (1999); Colo.Rev.Stat. § 16–16–101, *et seq.* (2006); Conn. Gen.Stat. §§ 53a–187, *et seq.* & 54–41a, *et seq.* (2001); Del.Code tit. 11, § 2401, *et seq.* (2001); D.C.Code § 23–541, *et seq.* (2001); Fla. Stat. § 934.01, *et seq.* (2001); Ga.Code § 16–11–60, *et seq.* (2003); Haw.Rev. Stat. § 803–41, *et seq.* (1993); Idaho Code § 18–6701, *et seq.* (2004); Ill. Comp. Stat. ch. 720, § 5/14–1 (2003); Ind. Stat. § 35–33.5–1–5, *et seq.* (1998); Iowa Code § 808B.1, *et seq.* (2003); Kan. Stat. § 22–2614, *et seq.* (1995); La.Rev. Stat. § 15:1301, *et seq.* (2005); Me.Rev.Stat. tit. 15, § 709, *et seq.* (2003); Md. Cts. Jud. Pro.Code § 10–401, *et seq.* (2006); Mass. Gen. L. ch. 272, § 99 (2000); Minn.Stat. § 626A.01, *et seq.* (2003); Miss.Code § 41–29–501, *et seq.* (1999); Mo. Stat. § 542.400, *et seq.* (2002); Neb.Rev. Stat. § 86–701, *et seq.* (1999); Nev.Rev.Stat. § 179.410, *et seq.* (2005); N.H.Rev.Stat. § 570–A:1, *et seq.* (2003); N.J. Stat. § 2A:156A–1, *et seq.* (1985); N.M. Stat. § 30–12–1, *et seq.* (2004); N.Y.Crim. Pro. Stat. § 700.05, *et seq.* (1996); N.C. Gen.Stat. § 15A–286, *et seq.* (2005); N.D. Cen.Code § 29–29.2–01, *et seq.* (2006); Ohio Rev.Code § 2933.51, *et seq.* (2006); Okla. Stat. tit. 13, § 176.1, *et seq.* (2002); Ore.Rev.Stat. § 133.721, *et seq.* & § 165.535, *et seq.* (2005); Pa. Consol. Stat. tit. 18, § 5701, *et seq.* (2000); R.I. Gen. L. § 12–5.1–1, *et seq.* (2002); S.C.Code § 17–30–10, *et seq.* (2006); S.D. Codified L. § 23A–35A–1, *et seq.* (2004); Tenn.Code § 40–6–301, *et seq.* (2006); Tex.Code Crim. Pro. Arts. 18.20 (Supp.2006) & 18.21 (2005) & Tex. Pen. Code § 16.01, *et seq.* (2003); Utah Code § 77–23a–1, *et seq.* (2003); Va.Code § 19.2–61, *et seq.* (2004); Wis. Stat. § 968.27, *et seq.* (1998); Wyo. Stat. § 7–3–701, *et seq.* (2005).

25. The following jurisdictions authorize one-party consent by statute: Ariz.Rev.Stat. § 13–3012(9) (Supp.2006); Ark.Code §§ 5–60–120(a) & (c) (2005); Cal.Penal Code § 633.5 (1999); Colo.Rev.Stat. §§ 18–9–303 & 304 (2006); Del. Code tit. 11, § 2402(c)(4) (2001); D.C.Code § 23–542(b)(2) (2001); Fla. Stat. § 934.03(2)(c) (Supp.2007); Ga.Code § 16–11–66(a) (2003); Haw.Rev.Stat. § 803–42(b)(4) (1993); Idaho Code § 18–6702(2)(c) (2004); Iowa Code § 808B.2.2.b (2003); La.Rev.Stat. § 15:1303(C)(3) (Supp.2006); Me.Rev.Stat. tit. 15, § 709(4) (2003); Md. Cts. Jud. Pro.Code § 10–402(c)(2) (2006); Mass. Gen. L. ch. 272, § 99(B)(4) (2000); Minn.Stat. § 626A.02(2)(c) (2003); Miss.Code § 41–29–531(d) (Supp.2006); Mo. Stat. § 542.402(2)(2) (2002); Neb.Rev.Stat. § 86–702(2)(b) (1999); N.M. Stat. § 30–12–1(E)(3) (2004); N.Y.Crim. Pro. Stat. § 700.05(3) (1996); N.C. Gen.Stat. § 15A–287(a) (2005); N.D. Cen.Code § 29–29.2–05 (2006); Ohio Rev. Code § 2933.52(B)(4) (2006); Okla. Stat. tit. 13, § 176.4(4) (2002); S.C.Code § 17–30–30(B) (2006); S.D. Codified L. § 23A–35A–20 (2004); Tex. Pen.Code § 16.02(c)(3) (Supp.2006); Utah Code § 77–23a–4(7)(a) (2003); Va.Code § 19.2–62(B)(2) (2004); Wis. Stat. § 968.31(2)(b) (Supp. 2006) (1998); Wyo. Stat. § 7–3–702(b)(I) (2005).

California's statute authorizes very narrow circumstances in which one-party consent electronic surveillance may occur. Even so, the Supreme Court of California has recognized a general rule that one-party consent electronic surveillance is permissible. *See People v. Towery,* 174 Cal.App.3d 1114, 220 Cal.Rptr. 475 (1985).

Only six jurisdictions that statutorily authorize one-party consent for the use of electronic surveillance devices have addressed the issue in the context of an informant recording communications in the home of a suspect: Florida, Ohio, Massachusetts, Mississippi, Wisconsin, and Wyoming. Among these, the decisions of the Supreme Courts of Florida and Massachusetts are particularly instructive.

In *State v. Sarmiento*, 397 So.2d 643 (Fla. 1981), the Florida Supreme Court rejected the ruling in *White* and held that the search and seizure provision of the state constitution prohibited an informant from using an electronic surveillance device in a suspect's home without judicial authorization. In response to the decision in *Sarmiento*, the people of Florida amended the state's constitutional search and seizure provision to require that it be "construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court." Fla. Const. art. 1, § 12 (2004). As a result of this amendment, the Florida Supreme Court in *State v. Hume*, 512 So.2d 185 (Fla.1987), held that "the recording of conversations between a defendant and an undercover agent in a defendant's home, such as occurred in the instant case [without a warrant], does not violate the fourth amendment of the United States Constitution and, accordingly, does not violate the newly adopted article I, section 12, of the Florida Constitution." *Hume*, 512 So.2d at 188. In addition to the court in *Hume*, two other courts have held that the search and seizure provision of their respective state constitutions allows an informant to secretly wear an electronic surveillance device in a suspect's home without judicial authorization. *See Lee v. State*, 489 So.2d 1382 (Miss.1986) (upholding surveillance under state and federal constitutions); *Almada v. State*, 994 P.2d 299 (Wyo.1999) (upholding surveillance under state constitution).[26]

In *Commonwealth v. Blood*, 400 Mass. 61, 507 N.E.2d 1029 (1987), the Massachusetts Supreme Court was called upon to decide whether the search and seizure provision of the state's constitution allowed the police to send an informant into the home of suspects, without a warrant, to record communications. In resolving this issue, the *Blood* decision rejected the United States Supreme Court's ruling in *White*, and found that the Massachusetts Constitution required issuance of a search warrant. The *Blood* opinion reasoned as follows:

[I]n circumstances not disclosing any speaker's intent to cast words beyond a narrow compass of known listeners, we conclude that it is objectively reasonable to expect that conversational interchange in a private home will not be invaded surreptitiously by warrantless electronic transmission or recording. The remaining question is whether "one party consent" so alters the balance as to obviate the need for a warrant requirement. It does not. Such consent only affords the State a person willing to transport the invisible instruments of eavesdropping into "earshot."

. . . .

. . . [T]he consent exception puts the conversational liberty of every person in the hands of any officer lucky enough to find a consenting informant.

. . . .

. . . [T]he Commonwealth relies . . . on [several] arguments. None is persuasive. The first of these arguments asserts, according to the Commonwealth, that because the person subject to the warrantless interception is a "wrongdoer," [he] should be made to bear the risk of betrayal. This argument proceeds from a pernicious assumption, that anyone subjected to surveillance by police is, because of that fact, necessarily a "wrongdoer." It is the purpose of the warrant requirement . . . to subject police suspicions to the scrutiny of a neutral and detached magistrate instead of [leaving them to be] judged by the officer engaged in the often competitive enterprise of ferreting out crime. Little would be left of anyone's justifiable reliance on privacy . . . if everyone must real-

---

**26.** *See also State v. Azzi*, No. 558, 1983 WL 6726 (Ohio Ct.App. Sept. 28, 1983) (upholding surveil- lance under federal constitution).

ize that he will be free from warrantless electronic intrusion only so long as someone in the government does not suspect him of improper conduct or wrong thinking[.]

The relevant question is not whether criminals must bear the risk of warrantless surveillance, but whether it should be imposed on all members of society. The *White* plurality underestimated this risk because it perceived no distinction of constitutional moment between the common gossip and the "wired" informant. For us, however, a distinction lies in the disparity between that sense of security which is felt among trusted friends and the feelings of hostility encountered among competitors or combatants. The sense of security is essential to liberty of thought, speech, and association.

. . . .

The Commonwealth urges consideration of the principle developed in *White* that a defendant who has no constitutional right to exclude the informer's unaided testimony . . . has [no constitutional] privilege against a more accurate version of the events in question. We do not dispute the premise that arguably more accurate evidence may be gathered if police electronically record conversations than if a participant trusts solely to his memory when testifying. And we agree that a criminal defendant cannot rely on the exclusion of the testimony of an informer's personal, unmediated account of what was said. The probative value of evidence wrongfully obtained does not, however, justify a search or seizure in defeat of constitutional safeguards.

We conclude that it is unreasonably intrusive to impose the risk of electronic surveillance on every act of speaking aloud to another person. We cannot conclude that, in the absence of a warrant, the consent of less than all the partakers of a conversation is sufficient to waive any participant's rights pursuant to [the search and seizure

provision] not to be recorded. If a person commits his secret thoughts to paper, that is no license for the police to seize the paper; if a person communicates his secret thoughts verbally [sic] to another, that is no license for the police to record the words. . . . The right of privacy would mean little if it were limited to a person's solitary thoughts, and so fostered secretiveness.

. . . .

Judicially supervised use of electronic surveillance by law enforcement officers is not forbidden by [our constitution]. [I]t is too easy to forget—and, hence, too often forgotten—that the issue here is whether to interpose a search warrant procedure between law enforcement agencies engaging in electronic eavesdropping and the public generally. . . . Interposition of a warrant requirement is designed not to shield "wrongdoers," but to secure a measure of privacy and a sense of personal security throughout our society.

No warrant was sought by [the police in this case]. Three days elapsed between [the informant's] agreement to be wired and the taping of the first conversation admitted in evidence; nine more days elapsed before a second conversation was taped. Thus, we perceive no exigency which prevented the procurement of a warrant. Each conversation whose recorded contents was admitted at trial had unfolded in a person's home, in circumstances not even remotely suggestive of any speaker's intent to be heard beyond the circle of known listeners. As to each of those conversations, we hold that its warrantless electronic search by surreptitious transmission and its electronic seizure by surreptitious recording were in violation of [our constitution].

*Blood,* 507 N.E.2d at 1034–38 (internal quotations and citations omitted).[27]

*(b) States without Title III type one-party consent statutes.* The electronic surveillance

---

**27.** In *State v. Smith,* 72 Wis.2d 711, 242 N.W.2d 184 (1976), the Wisconsin Supreme Court held that one-party consent surveillance evidence obtained in a suspect's home was inadmissible under the language of that state's electronic surveillance statutes. However, in 1989 the Wisconsin Legislature amended the statutes to permit one-party consent surveillance for felony drug investigations.

statutes in 13 jurisdictions differ from Title III in that they do not authorize the police to unilaterally engage in one-party consent surveillance. Pursuant to these statutes, the police are required to obtain authorization from a judicial officer or the Attorney General in order to equip an informant with an electronic surveillance device, for the purpose of recording communications with a suspect.[28] The issue of an informant recording communications in the home of a suspect, without lawful authorization, has been addressed by seven of these jurisdictions: Alaska, Indiana, Kansas, Nevada, Oregon, Pennsylvania, and Washington.

In the cases of *Snellgrove v. State,* 569 N.E.2d 337 (Ind.1991), and *State v. Wright,* 74 Wash.2d 355, 444 P.2d 676 (1968), the courts were called upon to decide whether the Fourth Amendment to the federal constitution prohibited warrantless electronic surveillance in a suspect's home by an informant. Both courts held that the Fourth Amendment was not violated by such conduct. The courts in *Snellgrove* and *Wright* were not called upon to decide the issue on state constitutional grounds. The courts in *State v. Roudybush,* 235 Kan. 834, 686 P.2d 100 (1984), and *State v. Bonds,* 92 Nev. 307, 550 P.2d 409 (1976), construed their respective surveillance statutes as not prohibiting an informant from recording communications in a suspect's home without a warrant. The courts in *Roudybush* and *Bonds* also were not called upon to decide the issue in the context of their state constitutions. In *State v. Fleetwood,* 331 Or. 511, 16 P.3d 503 (2000), the Oregon Supreme Court held that the electronic surveillance statutes of that state

did not permit the police to send an informant into a suspect's home with a recording device without a warrant. The court in *Fleetwood* prevented one-party consent surveillance in the home on statutory grounds, but not on constitutional grounds.

The court in *State v. Glass,* 583 P.2d 872 (Alaska 1978), *opinion on reh'g,* 596 P.2d 10 (Alaska 1979),[29] was asked to decide whether the Alaska Constitution was violated when an informant, without a warrant, wore an electronic surveillance device in a suspect's home that allowed the police to record the communication. In resolving the issue, the court in *Glass* rejected the holding by the United States Supreme Court in *White,* and found that the state's constitutional search and seizure and right to privacy provisions prohibited warrantless electronic surveillance in the home of a suspect. The *Glass* Court reasoned as follows:

> In construing similar provisions of Alaska's Constitution, we, of course, give careful consideration to the holdings of the United States Supreme Court, although we are not bound by them. *White,* however, does not present a clear cut agreement by any majority of the justices, and our decision as to Alaska's Constitution should therefore be influenced solely by the reasoning supporting the differing positions. Moreover, the United States Supreme Court has carefully stated: "[T]he protection of a person's General right to privacy his right to be let alone by other people is, like the protection of his property and of his very life, left largely to the law of the individual States."
>
> . . . .

---

**28.** *See* Alaska Stat. § 12.37.010, *et seq.* (2006); Conn. Gen.Stat. §§ 53a–187, *et seq.* & 54–41a, *et seq.* (2001); Ill. Comp. Stat. ch. 720, § 5/14–3(g–5) (Supp.2006) (permits Attorney General to authorize one-party consent); Ind. Stat. § 35–33.5–1–5, *et seq.* (1998); Kan. Stat. § 22–2614, *et seq.* (1995); Nev.Rev.Stat. § 179.410, *et seq.* (2005) (allows one-party consent in an emergency); N.H.Rev.Stat. § 570–A:1, *et seq.* (2003) (permits Attorney General to authorize one-party consent); N.J. Stat. § 2A:156A–1, *et seq.* (1985) (permits Attorney General to authorize one-party consent); Ore.Rev.Stat. § 133.721, *et seq.* & § 165.535, *et seq.* (2005); Pa. Consol. Stat. tit. 18, § 5701, *et seq.* (2000) (permits Attorney General to authorize one-party consent); R.I. Gen. L. § 12–5.1–1, *et seq.* (2002); Tenn.Code § 40–6–

301, *et seq.* (2006); Wash. Rev.Code § 9.73.010, *et seq.* (2003).

The Supreme Court of Connecticut has held that warrantless one-party consent recording is not prohibited, even though it is not statutorily authorized. *See State v. Grullon,* 212 Conn. 195, 562 A.2d 481 (1989). The Supreme Court of Washington permits warrantless one-party consent recording only when the communication is not deemed private. *See State v. Clark,* 129 Wash.2d 211, 916 P.2d 384 (1996).

**29.** The opinion on rehearing addressed the issue of the prospective application of the original opinion.

It is, of course, easy to say that one engaged in an illegal activity has no right to complain if his conversations are broadcast or recorded. If, however, law enforcement officials may lawfully cause participants secretly to record and transcribe private conversations, nothing prevents monitoring of those persons not engaged in illegal activity, who have incurred displeasure, have not conformed or have espoused unpopular causes.

. . . .

It seems only just that conduct of those engaged in criminal activity be revealed. Legitimate interests of law enforcement authorities, however, may generally be met in the same manner as in other searches and seizures. In the absence of limited exceptions, a search warrant should be obtained from an impartial magistrate, based on probable cause to believe that criminal activity will be discovered, before electronic monitoring of conversations should be allowed. It may be that, as in other search and seizure contexts, the requirement of a warrant may be obviated under exigent circumstances. We withhold passing on that issue until presented with a specific case. Generally, however, a search warrant should be required before permitting electronic monitoring of conversations.

We believe that this requirement will not unreasonably impinge on legitimate law enforcement efforts. . . . In Glass' case, it appears that [the informant] believed she could purchase heroin at Glass' home. If there were probable cause for the belief, a warrant could have been secured. Just as the warrant requirement protects against unreasonable search and seizures, it can prevent improper invasions of privacy by electronic monitoring. Alaska's Constitution mandates that its people be free from invasions of privacy by means of surreptitious monitoring of conversations.

*Glass,* 583 P.2d at 876–81 (internal quotations and citations omitted).

In *Commonwealth v. Brion,* 539 Pa. 256, 652 A.2d 287 (1994), the Pennsylvania Supreme Court had to decide whether the search and seizure provision of that state's constitution permitted an informant to use an electronic surveillance device in a suspect's home without a warrant. Under Pennsylvania's electronic surveillance statute, as it existed at that time, one-party consent surveillance was authorized. The court in *Brion* found that the state constitution required a warrant to be issued before an informant with an electronic surveillance device could enter the home of a suspect. The court reasoned as follows:

To determine whether one's activities fall within the right of privacy, we must examine: first, whether Appellant has exhibited an expectation of privacy[;] and second, whether that expectation is one that society is prepared to recognize as reasonable.

. . .[T]he instant case involves conversations taking place in the sanctity of one's home. If nowhere else, an individual must feel secure in his ability to hold a private conversation within the four walls of his home. For the right to privacy to mean anything, it must guarantee privacy to an individual in his own home. . . . Upon closing the door of one's home to the outside world, a person may legitimately expect the highest degree of privacy known to our society.

. . . .

. . . An individual has a constitutionally protected right to be secure in his home. . . . [Consequently,] we hold that an individual can reasonably expect that his right to privacy will not be violated in his home through the use of any electronic surveillance. In so holding, we need not find [the statute] unconstitutional. We must presume that the General Assembly did not intend to violate the constitution, and will construe a statute so as to sustain its validity if such is fairly possible. With respect to oral communications occurring within one's home, interception pursuant to [the statute] can only be deemed constitutional under Article 1, Section 8 if there has been a prior determination of probable cause by a neutral, judicial authority. In light of the General Assembly's preference expressed elsewhere in the Act that probable cause determinations regarding other electronic surveillance be made by a judge

of the Superior Court, for consistency we believe that such procedures should be applied in fulfilling this probable cause/warrant requirement.

In this case, there is no evidence to suggest that Brion committed any act which would reasonably lead to the conclusion that he did not have an expectation of privacy within his home. Because there was no determination of probable cause by a neutral judicial authority, the consensual body wire violated Article I, Section 8 and the tape recording of the transaction in Brion's home should have been suppressed.

*Brion*, 652 A.2d at 288–89 (internal quotations and citations omitted).

**3. Summation.** The above analysis indicates that the appellate courts in at least fifteen states have addressed the issue of an informant entering the home of a suspect, while the informant was wearing an electronic surveillance device not judicially approved. Nine courts permit such surveillance,[30] however, only four of those courts have decided the issue on state constitutional grounds.[31] Six courts prohibit such surveillance,[32] and four of those courts have done so on state constitutional grounds.[33] Thus, it would appear that half of the courts in other states addressing the issue have rejected the *White* decision on state constitutional grounds, and thus prohibit an informant from entering the home of a suspect while wearing an electron-

ic surveillance device without a search warrant having been issued.

## C. An Informant's Use of an Electronic Surveillance Device in the Home of Another under the Laws of West Virginia

Now, we must decide whether West Virginia's statutory electronic surveillance statutes and the constitutional search and seizure provision permit a police informant to enter the home of a suspect while wearing a surveillance device without first obtaining judicial authorization.

**1. West Virginia's electronic surveillance statutes.** In 1987, the West Virginia Legislature enacted the West Virginia Wiretapping and Electronic Surveillance Act (hereinafter "the Act"), codified at W. Va. Code § 62–1D–1, *et seq.*[34] As a general matter, the Act makes it unlawful for anyone to "[i]ntentionally intercept, attempt to intercept or procure any other person to intercept or attempt to intercept, any wire, oral or electronic communication." W. Va.Code § 62–1D–3(a)(1) (1987) (Repl.Vol.2005). A violation of this provision is a felony offense.[35] *See* W. Va.Code § 62–1D–3(a)(3).[36] Further, the Act provides "[t]hat evidence obtained in violation of the provisions of this article shall not be admissible in any proceeding." W. Va.Code § 62–1D–6 (1987) (Repl Vol.2005).

---

**30.** *See State v. Hume*, 512 So.2d 185 (Fla.1987); *Snellgrove v. State*, 569 N.E.2d 337 (Ind.1991); *State v. Roudybush*, 235 Kan. 834, 686 P.2d 100 (1984); *People v. Collins*, 438 Mich. 8, 475 N.W.2d 684 (1991) (decision did not involve an informant in the home, but it overruled a prior case that prohibited in-home surveillance by an informant); *Lee v. State*, 489 So.2d 1382 (Miss. 1986); *State v. Bonds*, 92 Nev. 307, 550 P.2d 409 (1976); *State v. Azzi*, No. 558, 1983 WL 6726 (Ohio Ct.App. Sept. 28, 1983); *State v. Wright*, 74 Wash.2d 355, 444 P.2d 676 (1968); *Almada v. State*, 994 P.2d 299 (Wyo.1999).

**31.** *See State v. Hume*, 512 So.2d 185 (Fla.1987); *People v. Collins*, 438 Mich. 8, 475 N.W.2d 684 (1991) (decision did not involve an informant in the home, but it overruled a prior case that prohibited in-home surveillance by an informant); *Lee v. State*, 489 So.2d 1382 (Miss.1986); *Almada v. State*, 994 P.2d 299 (Wyo.1999).

**32.** *See State v. Glass*, 583 P.2d 872 (Alaska 1978); *Commonwealth v. Blood*, 400 Mass. 61, 507

N.E.2d 1029 (1987); *State v. Fleetwood*, 331 Or. 511, 16 P.3d 503 (2000); *Commonwealth v. Brion*, 539 Pa. 256, 652 A.2d 287 (1994); *State v. Blow*, 157 Vt. 513, 602 A.2d 552 (1991); *State v. Smith*, 72 Wis.2d 711, 242 N.W.2d 184 (1976) (modified by statute).

**33.** *See State v. Glass*, 583 P.2d 872 (Alaska 1978); *Commonwealth v. Blood*, 400 Mass. 61, 507 N.E.2d 1029 (1987); *Commonwealth v. Brion*, 539 Pa. 256, 652 A.2d 287 (1994); *State v. Blow*, 157 Vt. 513, 602 A.2d 552 (1991).

**34.** The Act is patterned after Title III.

**35.** There are other prohibitions under the Act which are not relevant to this case.

**36.** The Act also provides a civil remedy for a violation. *See* W. Va.Code § 62–1D–12 (1987) (Repl.Vol.2005).

The Act permits the use of an electronic surveillance device for investigating specifically enumerated offenses,[37] when authorized by a designated circuit court judge.[38] Pursuant to the Act, a county prosecutor [39] or a duly authorized member of the state police [40] may make an application for a warrant to intercept communication with an electronic surveillance device. The Act permits a judge to issue a warrant only if the evidence and argument presented by the applicant establishes that:

(1) There is probable cause to believe that one or more individuals are committing, have committed, or are about to commit one or more of the particular offenses enumerated in [§ 62–1D–8] of this article;

(2) There is probable cause for belief that particular communications concerning such offense or offenses will be obtained through the interception;

(3) Normal investigative procedures have been tried and have failed and reasonably appear to be unlikely to succeed if attempted again, or that to do so would be unreasonably dangerous and likely to result in death or injury or the destruction of property; and

(4) There is probable cause to believe that the facilities from which, or the place where, the wire, oral or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of the offense, or offenses are leased to, listed in the name of, or commonly used by this person.

W. Va.Code § 62–1D–11(c).

The Act provides for a one-party consent exception to the warrant requirement. This exception is contained in W. Va. § 62–1D–3(b)(2) as follows:

It is lawful under this article for a person to intercept a wire, oral or electronic communication where the person is a party to the communication or where one of the parties to the communication has given prior consent to the interception unless the communication is intercepted for the purpose of committing any criminal or tortious act in violation of the constitution or laws of the United States or the constitution or laws of this state.[41]

(Footnote added). Until now, this Court has never been called upon to decide whether the Act's one-party consent exception permits the police to send an informant into a suspect's home with an electronic surveillance device, but without · judicial authorization. However, in two prior decisions we have interpreted the Act's one-party consent exception as permitting the police to record communications between a suspect and an informant that *did not occur* in a suspect's home.[42]

---

**37.** The crimes for which a circuit court judge may authorize electronic surveillance are set out in W. Va.Code § 62–1D–8 (1987) (Repl.Vol. 2005).

**38.** The Act sets out the procedure for designating specific circuit court judges to authorize electronic surveillance. Under the Act, "[t]he chief justice of the supreme court of appeals shall, on an annual basis, designate five active circuit court judges to individually hear and rule upon applications for orders authorizing the interception of wire, oral or electronic communications." W. Va.Code § 62–1D–7 (1987) (Repl.Vol.2005).

**39.** *See* W. Va.Code § 62–1D–8.

**40.** *See* W. Va.Code § 62–1D–11(a)(1) (1987) (Repl.Vol.2005).

**41.** It should be noted that the one-party exception of the Act differs from Title III in that the Act does not use the phrase "color of law" that is found in Title III. Even so, the language in the Act extends both to someone acting under the color of law and to someone not acting under the color of law. The one-party consent statutes of several states track the language used in the Act. *See* Ariz.Rev.Stat. § 13–3012(9) (Supp.2006); Ark.Code § 5–60–120(a) & (c) (2005); Cal.Penal Code § 633.5 (1999); Colo.Rev.Stat. §§ 18–9–303 & 304 (2006); Del.Code tit. 11, § 2402(c)(4) (2001); Ga.Code § 16–11–66(a) (2003); Me.Rev. Stat. tit. 15, § 709(4) (2003); Md. Cts. Jud. Pro. Code § 10–402(c)(2) (2006); Mass. Gen. L. ch. 272, § 99(B)(4) (2000); N.Y.Crim. Pro. Stat. § 700.05(3) (1996); N.C. Gen.Stat. § 15A–287(a) (2005); Ohio Rev.Code § 2933.52(B)(4) (2006); S.D. Codified L. § 23A–35A–20 (2004); Tex. Pen. Code § 16.02(c)(3) (Supp.2006); Va.Code § 19.2–62(B)(2) (2004); Wyo. Stat. § 7–3–702(b)(I) (2005).

**42.** In *Marano v. Holland*, 179 W.Va. 156, 366 S.E.2d 117 (1988), we were called upon to address the one-party consent provision of Title III. We stated in Syllabus point 15 of *Marano* that "[o]ne spouse's interception of telephone com-

In *State v. Dillon*, 191 W.Va. 648, 447 S.E.2d 583 (1994), the police, without a warrant, placed an electronic surveillance device on an informant in order to record drug transactions between the informant and the defendant. The police were able to record several conversations between the informant and the defendant while they were in a car and on the street. As a result of the surreptitious recordings, the defendant was indicted and prosecuted for drug trafficking. During the trial, the informant did not appear. Consequently, the prosecutor introduced the tape recordings into evidence. The defendant was convicted. He appealed. One of the issues raised by the defendant was that the tape recordings should not have been allowed into evidence because there was no testimony by the informant indicating the informant consented to wearing the electronic surveillance device. We rejected this argument and held that,

> Proof of consent for purposes of electronic intercept set forth in West Virginia Code §§ 62–1D–3 and 62–1D–6 need not be proven solely by the consenting individual's testimony, but can be proven through other evidence, such as the testimony of the person to whom the consent was given, that the consenting individual actually consented to the electronic intercept.

Syl. pt. 1, *Dillon*, 191 W.Va. at 657, 447 S.E.2d at 592.

In *State v. Williams*, 215 W.Va. 201, 599 S.E.2d 624 (2004), a fifteen-year-old sexual assault victim gave the police permission to place a wiretap on her telephone to record a conversation she had with the defendant, her attacker.[43] The defendant was subsequently arrested and prosecuted for sexual assault. During the trial, the taped telephone conversation was introduced into evi-

dence. The defendant was ultimately convicted, and he appealed. One of the issues raised in the appeal by the defendant was that the telephone wiretap was illegal because the Act did not permit a child to give consent to electronic recording. This Court rejected the argument. In doing so, we found that the applicable definitions provided under the Act did not make a distinction between an adult and a child. *Williams* stated "[t]he statute simply contains no vicarious consent exception for minors, and we refuse to find that one exists without a statutory basis to do so." *Williams*, 215 W.Va. at 207, 599 S.E.2d at 630.[44]

We believe that, under the decisions in *Dillon* and *Williams*, the one-party consent exception of the Act permits the police to equip an informant with an electronic surveillance device and, without a warrant, send the informant into the home of a suspect. Consequently, in the instant case, the Act permitted the police to send an informant into Mr. Mullens' home while the informant was wearing an electronic surveillance device.

**2. One-party consent to electronic surveillance in the home of a suspect and the search and seizure provision of the West Virginia Constitution.** Although we have concluded that the conduct complained of in the instant case was lawful under the Act, we must now decide whether the search and seizure provision of our state constitution permits one-party consent to electronic surveillance in the home of a suspect without a warrant.[45] Article 3, § 6 of the West Virginia Constitution provides:

> The rights of the citizens to be secure in their houses, persons, papers and effects, against unreasonable searches and sei-

munications by the other is a violation of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, et seq., which by its terms renders them inadmissible." 179 W.Va. 156, 366 S.E.2d 117.

**43.** The defendant had previously abducted the girl, but returned her to her home.

**44.** In a child custody case we held that "[a] parent has no right on behalf of his or her children to give consent under W. Va.Code, 62–1D–3(c)(2) (1987) ... to have the children's con-

versations with the other parent recorded while the children are in the other parent's house." Syl. pt. 4, *W. Va. Dep't of Health & Human Res. ex rel. Wright v. David L.*, 192 W.Va. 663, 453 S.E.2d 646 (1994).

**45.** We wish to be clear that our concern here is only with the use of an electronic surveillance device by an informant while in the home of a suspect. Our decision has no impact on the authority of the police to place a bodywire on an informant to record communications with a suspect outside the suspect's home.

zures, shall not be violated. No warrant shall issue except upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, or the person or thing to be seized.

■ We have indicated that the purpose of article 3, § 6 "is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement officers, so as to safeguard the privacy and security of individuals against arbitrary invasions [by governmental officials]." *State v. Legg*, 207 W.Va. 686, 692, 536 S.E.2d 110, 116 (2000) (internal quotations and citations omitted). This Court has also held that "[t]he provisions of the Constitution of the State of West Virginia may, in certain instances, require higher standards of protection than afforded by the Federal Constitution." Syl. pt. 2, *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979). Therefore, the mere fact that the Fourth Amendment has been interpreted as allowing one-party consent electronic surveillance in the home of a suspect does not mean that this Court is required to interpret article III, § 6 in the same manner. "This Court has determined repeatedly that the West Virginia Constitution may be more protective of individual rights than its federal counterpart." *State ex rel. Carper v. West Virginia Parole Bd.*, 203 W.Va. 583, 590 n. 6, 509 S.E.2d 864, 871 n. 6 (1998). In other words, we may "interpret state constitutional guarantees in a manner different than the United States Supreme Court has interpreted comparable federal constitutional guarantees."

*Peters v. Narick*, 165 W.Va. 622, 628 n. 13, 270 S.E.2d 760, 764 n. 13 (1980).

The order of the circuit court and the briefs of the parties failed to cite to any prior decision of this Court addressing the issue of whether our state constitution permits one-party consent to electronic surveillance in the home of a suspect without a warrant. However, this Court has previously addressed the issue. The issue arose in a case that was decided approximately one year. before the Act was created.

· In *State v. Thompson*, 176 W.Va. 300, 342 S.E.2d 268 (1986), the police had information that the defendant was selling drugs. As a result of this information the police, without a warrant, placed a radio transmitter on the informant and sent him to the defendant's home. While in the defendant's home, the informant purchased drugs, and the transaction was monitored and recorded by the police. The defendant was subsequently prosecuted and found guilty of drug trafficking. One of the issues raised on appeal was that it was error to introduce the tape recording of the drug transaction. The defendant alleged that the tape recording was made in violation of article III, § 6 because the police did not obtain a warrant to have the informant enter his home with an electronic surveillance device. This Court disagreed. In doing so, this Court very briefly looked at its prior decision that involved one-party consent surveillance outside the home.[46] Based upon that decision the Court tersely reasoned as follows:

---

**46.** The case discussed and relied upon in the *Thompson* opinion was *Blackburn v. State*, 170 W.Va. 96, 290 S.E.2d 22 (1982). The decision in *Blackburn* involved a tape recording of a. telephone conversation that occurred between the defendant and an informant acting in cooperation with the police. *Blackburn* held that the recording was lawful. In doing so, the opinion set out the following in Syllabus point 4:

Warrantless electronic recording of a defendant's conversation with the consent of a participant to the conversation who, unknown to the defendant, is acting in concert with the police does not violate the prohibition against unreasonable searches and seizures contained in article 3, section 6 of our state constitution. 170 W. Va. 96, 170 W.Va. 96, 290 S.E.2d 22.

The opinion also briefly discussed, but distinguished, the case of *Farruggia v. Hedrick*, 174

W.Va. 58, 322 S.E.2d 42 (1984). The opinion in *Farruggia* involved a police informant who recorded conversations with the defendant while in a parking lot, a car, and at the office of the defendant's attorney. Because the defendant was indicted at the time of the recordings, this Court found that the recordings violated the defendant's right to counsel. In the single syllabus point of the opinion this Court held the following:

The Sixth Amendment to the Constitution of the United States prohibits the use at trial of incriminating statements made by a defendant to an accomplice after indictment and without the assistance of counsel when the accomplice was cooperating with the police and was equipped secretly to transmit and record the conversation. 174 W.Va. 58, 174 W.Va. 58, 322 S.E.2d 42.

The Court also believes that the defendant's contention that the surveillance was made without a warrant and uninvited constituted an illegal search and seizure is without merit. . . .

. . . .

Taking the [prior decision into consideration], it is clear that a warrantless electronic recording of a defendant's conversation made before his Sixth Amendment right to counsel has attached, and made with the consent of a participant to the conversation who, unknown to the defendant, is acting in concert with the police, does not violate the prohibition against unreasonable searches and seizures guaranteed by the Fourth Amendment to the United States Constitution and by article III, section 6 of the West Virginia Constitution.

Clearly the tape involved in the case presently before the Court was made with the knowledge and consent of [the informant]. At the time the defendant had neither been arrested nor indicted. . . . We believe that the tape was admissible into evidence.

*Thompson*, 176 W.Va. at 305–06, 342 S.E.2d at 273–72.

We are troubled by the complete lack of any analysis in *Thompson* on the issue of the expectations of privacy in the home. In reaching the conclusion that article III, § 6 allows the police to invade the privacy of a citizen's home, through an informant wearing an electronic surveillance device without judicial authorization, the *Thompson* opinion did not provide one sentence discussing the privacy in the home that article III, § 6 is designed to protect. *Thompson* assumed, without discussion, that no difference existed between a person's reasonable expectations of privacy in his/her home, versus the privacy a person expects outside the home. *See State v. Peacher*, 167 W.Va. 540, 567–68, 280 S.E.2d 559, 578 (1981) ("A person's expectation of privacy in his automobile is less than that which he would have in his home[.]"). This assumption by *Thompson* guts article III, § 6 and makes it a hollow constitutional protection from unreasonable searches and seizures in the home.

■ "There is no question . . . that activities which take place within the sanctity of the home merit the most exacting [article III, § 6] protection." *State v. Lacy*, 196 W.Va. 104, 111, 468 S.E.2d 719, 726 (1996). This Court has long held that article III, § 6 "protect[s] the rights of citizens from unreasonable searches and seizures in their houses." *State v. McNeal*, 162 W.Va. 550, 555, 251 S.E.2d 484, 488 (1979). For this reason, the jurisprudence of this Court addressing article III, § 6 has "drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *State v. Craft*, 165 W.Va. 741, 755, 272 S.E.2d 46, 55 (1980) (internal quotations and citation omitted). That is, with limited exceptions, "any search of a person['s] . . . dwelling on mere suspicion and the seizure of any article found as a result thereof, without . . . a search warrant, is an unlawful search and seizure in violation of Section 6, Article 3 of the Constitution of West Virginia." Syl. pt. 1, in part, *State v. Smith*, 156 W.Va. 385, 193 S.E.2d 550 (1972). *See also State v. Slat*, 98 W.Va. 448, 449, 127 S.E. 191, 192 (1925) ("Any search of a person's house without a valid search warrant is an unreasonable search, under section 6, art. 3, [of the] Constitution of West Virginia[.]"). We underscored the significance of the expectations of privacy in the home in *State v. W.J. B.*, 166 W.Va. 602, 612, 276 S.E.2d 550, 556 (1981):

> [T]here is still basic vitality to the ancient English rule that a man's home is his castle, and he has the right to expect some privacy and security within its confines. This rule arises from a societal recognition that the home shelters and is a physical refuge for the basic unit of society[,] the family. In the criminal law there is a marked recognition of this fact, as shown by the difference in the right to arrest a criminal without a warrant[,] as between his home and a public place.

*W.J. B.*, 166 W.Va. at 612, 276 S.E.2d at 556.

This Court's long history of protecting the sanctity of the home from warrantless searches and seizures counsels against allowing *Thompson* to stand. In Syllabus point 2

of *Dailey v. Bechtel Corp.*, 157 W.Va. 1023, 207 S.E.2d 169 (1974), this Court held:

> An appellate court should not overrule a previous decision recently rendered without evidence of changing conditions or serious judicial error in interpretation sufficient to compel deviation from the basic policy of the doctrine of stare decisis, which is to promote certainty, stability, and uniformity in the law.

Our decision to depart from stare decisis is based upon a "serious judicial error" in the *Thompson* opinion.[47] That error was the complete obliteration of the bright line this Court has historically drawn between searches and seizures in the home, versus searches and seizures outside the home. *Thompson* failed to acknowledge the existence of this distinction. Consequently, we now hold that it is a violation of West Virginia Constitution article III, § 6 for the police to invade the privacy and sanctity of a person's home by employing an informant to surreptitiously use an electronic surveillance device to record matters occurring in that person's home without first obtaining a duly authorized court order pursuant to W. Va. Code § 62–1D–11 (1987) (Repl.Vol.2005). To the extent that *State v. Thompson*, 176 W.Va. 300, 342 S.E.2d 268 (1986), holds differently, it is overruled.

 We are mindful that, in addition to *Thompson*, the wording of the state's electronic surveillance Act permits an informant to enter the home of a suspect with a recording device without judicial authorization. However, our rejection of the *Thompson* decision does not require invalidation of the one-party consent provision of the Act. It is a longstanding fundamental principle of law that "[w]herever an act of the Legislature

can be so construed and applied as to avoid a conflict with the Constitution, and give it the force of law, such construction will be adopted by the courts." Syl. pt. 3, *Slack v. Jacob*, 8 W.Va. 612 (1875). *See State v. Siers*, 103 W.Va. 34, 36, 136 S.E. 504, 505 (1927) ("[I]t is a rule of constitutional interpretation that, when two constructions may be placed upon a statute, one of which renders it constitutional and the other unconstitutional, it is the duty of the courts to so limit the statute as to make it comply with constitutional requirements."). Our ruling today merely limits the one-party consent provision of the Act from being used to send an informant into the home of a suspect to record communications therein without having obtained a search warrant authorizing such conduct. Therefore we hold that, Article III, § 6 of the West Virginia Constitution prohibits the police from sending an informant into the home of another person under the auspices of the one-party consent to electronic surveillance provisions of W. Va.Code § 62–1D–3(b)(2) (1987) (Repl.Vol.2005) where the police have not obtained prior authorization to do so pursuant to W. Va.Code § 62–1D–11 (1987) (Repl.Vol.2005).

Turning to the facts of this case, there is no dispute. The police failed to obtain judicial authorization to send the informant into Mr. Mullens' home while the informant was wearing an electronic surveillance device. Consequently, the trial court should have granted Mr. Mullens' motion to suppress the electronic surveillance recordings obtained in his home by the informant. Insofar as Mr. Mullens entered a conditional plea of guilty, on remand he may exercise his right to withdraw the guilty plea and let a jury decide his fate.[48]

---

**47.** "Stare decisis rests upon the important principle that the law by which people are governed should be 'fixed, definite, and known,' and not subject to frequent modification in the absence of compelling reasons." *Bradshaw v. Soulsby*, 210 W.Va. 682, 690, 558 S.E.2d 681, 689 (2001) (Maynard, J., dissenting) (quoting *Booth v. Sims*, 193 W.Va. 323, 350 n. 14, 456 S.E.2d 167, 194 n. 14 (1995)).

**48.** We will point out that "[t]he application of our decision today ... is limited to the retrial of [Mr. Mullens] and to cases in litigation or on [direct] appeal during the pendency of this ap-

peal[.]" *State v. McCraine*, 214 W.Va. 188, 205 n. 21, 588 S.E.2d 177, 194 n. 21 (2003). In other words, we do not extend full retroactivity to our ruling in this case. *See* Syl. pt. 5, *State v. Blake*, 197 W.Va. 700, 478 S.E.2d 550 (1996) ("The criteria to be used in deciding the retroactivity of new constitutional rules of criminal procedure are: (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards. Thus, a judicial decision in a criminal case is to

## IV.

## CONCLUSION

The circuit court's conviction and sentencing order is reversed. This case is remanded for further disposition consistent with this opinion.

Reversed and Remanded.

BENJAMIN, Justice, dissenting:

(Filed April 13, 2007)

Fundamental to our justice system is the public's confidence in the integrity and predictability of court decisions. When the Court breaks with its prior rulings, inserts words and meanings into constitutional provisions and statutes that are plainly not there, and redefines easily-understood and long-accepted principles of justice, this Court invites and deserves fair criticism. This is such a case.

By departing from a reasoned application of the rule of law in favor of a pure judgment of policy, the majority opinion abandons all pretense of a principled use of established jurisprudence or applicable law to resolve the evidentiary issue present in this appeal. Despite the rhetorical invocation that it left "no stone unturned and no footnote unread," the majority opinion simply ignored, or avoided reference to, the overwhelming mountain of legal reasoning and authority that shatters any semblance of an acceptable legal basis for the majority's result.

The result-driven, policy-based nature of the majority's actions is apparent from the opinion's inception. According to the majority, this matter requires the Court to decide "whether the police can, without prior impartial judicial authorization, *solicit* a person to serve as a confidential informant, equip that person with an electronic surveillance device and *send him/her into the home of any citizen the police arbitrarily decide to investigate.*" Majority opinion, p. 73, 650 S.E.2d at 172 (emphasis added). I can only assume

be given prospective application only if: (a) It established a new principle of law; (b) its retroactive application would retard its operation; and (c) its retroactive application would produce inequitable results.").

that the use of such provocative, misleading and inaccurate wording was intended to mask the true nature of the criminal enterprise present herein by a not well-disguised appeal by the majority to our understandable fear of uncontrolled state power in the face of rights necessary to the maintenance of a free society.[1] By Mr. Mullens' own admission, however, the majority's rendition is not what happened in this matter.

Equally gratuitous is the majority's resort, despite this Court's previous rulings to the contrary, to our State Constitution to justify their result. Our Constitution serves as a strong and independent repository of authority protective of the rights of West Virginia citizens. Rather than engage in a principled application of this Court's independent authority to interpret our State Constitution, the majority arbitrarily overrules at least one, and by implication several more, prior decisions of this Court—decisions which were impeccably reasoned and which established a readily understood and readily administered bright line rule. Further, by adopting its new pronouncement as a matter of constitutional mandate under Article III, Section 6 of our State Constitution, the majority has prevented the Legislature from making the policy decision on behalf of the People on this matter. Rather than engaging in the judicial chauvinism which pervades the majority opinion, I think it reasonable for us to ask: Is this decision wise? Does our Constitution authorize us to announce this anomalous rule and, by styling it a constitutional decree, to put it beyond the reach of the ordinary processes of representative government without so much as a plausible argument that such a pronouncement is now required? I fear my colleagues misapprehend the shallow depth of the jurisprudential ice upon which they now so boldly tread.

Ultimately, the majority cannot coherently explain what true constitutional right it is trying to protect here. The majority cannot

1. One might just as readily consider the threat posed to a free society by courts which depart from the rule of law in favor of policy-driven pronouncements developed behind the closed doors of judicial chambers rather than in the sunshine of legislative debate.

answer what primary constitutional concerns are inherent here that are not likewise present in other forms of passive recordings for which the majority finds no constitutional infirmity. The majority likewise is unable to provide a plausible explanation for why the State should be compelled here to seek a warrant to simply record by one mode of recording what is already being recorded by another mode of recording for which a warrant is not needed. What the majority does do is give special—and unwarranted—protections to an individual engaged in selling illicit drugs to a trusted customer who is, in reality, a State agent who will later offer testimony to prove the State's case against the individual. The majority finds fault amounting to a violation of our State Constitution not with the State's ability to collect information but in the means by which the State passively records such a criminal transaction. It is no wonder that the majority fails, or is unable, to identify what was the "search" and the "seizure" here.

## I.

### "There's no place like home" and Other Factual Misconceptions of the Majority Opinion

Crucial to the majority's analysis is the claim that the house in which Mullens chose to sell illicit drugs was a "home" and that the State's presence in this house was an unwelcome intrusion. Indeed, without any critical challenge to such misstatements, the majority simply "clicks its heels" invokes the mantra, "there's no place like home", and proceeds to turn half a century of constitutional jurisprudence from this Court, the United States Supreme Court and virtually every other federal and state court in this country

on its head with nary a whisper to the actual harm this decision causes to the notion of constitutional government and, I fear, ultimately to this Court's credibility. In view of the mountain of evidence which demonstrates not only that Mullens chose to transform this house into a place of unlawful business and that Mullens voluntarily invited the State's informant into this place of business so as to engage in an illicit drug transaction—an invitation which permitted the State's agent full auditory and visual access to everything within the house with no need whatsoever for a warrant—I read the majority opinion and must conclude that "we're not in Kansas anymore", or anywhere else where the rule of law subordinates the personal policy preferences of judges.[2]

In mis-characterizing the question before this Court in provocative terms—terms of emotion which arguably betray a predestined result—and by devoting the bulk of its opinion to seemingly irrelevant matters, the majority sadly misses an important opportunity for this Court to fully analyze the dual protections of our Federal and State Constitutions. If the majority truly sought to leave no stone unturned, it would also have addressed such issues as whether the confidential informant's passive recording of illegal activity inside the Mullens' residence actually constitutes a search and seizure (it does not), whether Mullens has a legitimate privacy interest in an illegal business conducted inside his home which is protected by the Fourth Amendment to the United States Constitution or Article III, Section 6 of the West Virginia Constitution (he does not), or whether this is simply an evidentiary matter (it is). Instead, the majority devotes much of its opinion to a discussion of the history of

2. In this case, the facts show that a confidential informant indicated to members of the U.S. 119 Drug and Violent Crimes Task Force that s/he could purchase illegal drugs at Mullens' home. Thereafter, the confidential informant went to the Mullens' residence while wired with audio and video recording equipment. The confidential informant knocked on the door, was invited in and purchased 3.23 grams of marijuana. The audio and video recording equipment captured the conversation leading to the drug buy, but did not capture the drugs changing hands on tape. Thus, the question actually before the Court was

whether a warrant is required before a confidential informant who is invited into a defendant's residence to purchase illegal drugs may passively record the transaction through the use of hidden audio and/or video equipment. The answer to that question under the prior precedent of this Court (precedent which was summarily dismissed by the majority), under over a half a century of United States Supreme Court precedent and under the overwhelming majority of jurisdictions in this country is a resounding "NO!"

federal electronic wiretapping statutes which have no bearing on the constitutionality of an informant's recording of a drug transaction and a summary dismissal as a plurality opinion of the one United States Supreme Court case, *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), the majority forces itself to acknowledge and deem is controlling on this Court with respect to the Fourth Amendment.[3] The majority fails to mention the wealth of decisions from this Court and the Supreme Court which support the *White* rationale. While the majority begrudgingly acknowledges, albeit in a string cite, a few (there are more) of the federal circuit court of appeals decisions recognizing the continued viability of *White*, it fails to acknowledge that the Supreme Court has denied any request to review those lower court decisions and revisit *White*.

The majority also devotes much of its opinion to discussing an informant's ability to record events in defendant's homes in other states. In so doing, the majority sidesteps the overwhelming majority of cases that find no constitutional violation and relies instead upon case law from five jurisdictions. As discussed below, with respect to four of those five decisions, the majority is forced to either (1) acknowledge that those decisions have been subsequently overruled or abrogated by constitutional amendment; (2) ignore that state constitutional privacy provisions, not found in the West Virginia Constitution, impacted the decision; or (3) ignore subsequent decisions undermining the scope attributed to the decision by the majority in this matter.

Only toward the end of its opinion does the majority discuss West Virginia law. However-

er, in order to reach the decision announced in its opinion, the majority is forced to depart from *stare decisis* and side-step this Court's precedent, expressly overrule one decision directly on point, implicitly overrule several others, and selectively read our wiretapping statute. Decisions in cases can have a significant impact on the lives of tens of thousands of West Virginians. Where the credibility and legitimacy of our court system derives directly from the public's confidence in the integrity and soundness of our legal opinions, I fear that that confidence will be severely tested by such actions.

This case does not involve the government's use of technology or electronics to listen in, or eavesdrop on, conversations to which its agent was not a participant. It does not involve technology to invade the security of the home. It does not involve the use of electronics to obtain personal information the government did not already have. It simply was another means of recording a drug transaction. This case likewise does not involve the use of technology by the government to enhance the senses of its agent. It does not involve the use of technology which can be termed "exotic" or unusual. No devices were "planted". There was no intrusion, no force and no compulsion. The electronics simply recorded what the informant was seeing and hearing. This case does not involve any sound or image not otherwise seen or heard by the informant.

This case does involve the use of technology to obtain the most reliable recordation of evidence for use in a criminal prosecution. It does involve a business transaction carried out in a location the defendant characterizes

---

**3.** In summarily dismissing *White,* the majority likewise neglects to mention this Court's prior reliance upon and endorsement of the *White* decision. *See, State v. Dillon,* 191 W.Va. 648, 657, 447 S.E.2d 583, 592 (1994); *Blackburn v. State,* 170 W.Va. 96, 103–05, 290 S.E.2d 22, 30–32 (1982); *State v. Andriotto,* 167 W.Va. 501, 508, 280 S.E.2d 131, 136 (1981) (involving recording of defendant's telephone conversation with witness who was cooperating with police). While *Dillon* and *Blackburn* are cited by the majority, their incorporation of the *White* holding is not acknowledged. While noting that "one of the issues" in *Dillon* involved the necessary proof of consent to record under the one-party consent exception to the West Virginia Wiretapping and

Electronic Surveillance Act, the majority fails to acknowledge that *Dillon* relied upon *White* for the proposition that the Fourth Amendment does not prohibit warrantless electronic recording of a conversation which is done with the consent of one party and that consent may be demonstrated by the testimony of the person to whom consent was given. *Dillon,* 191 W.Va. at 657, 447 S.E.2d at 592. Relegating *Blackburn* to a footnote, the majority is forced to acknowledge its holding that warrantless recording of a conversation by a person working in concert with the police does not violate Article III, Section 6, but fails to mention the *Blackburn* holding is based upon a "tacit approval of the *White* plurality." *Blackburn,* 170 W.Va. at 105, 290 S.E.2d at 32.

as a "home." It involves a government agent who was voluntarily invited into this "home" with a full ability to see and hear everything inside. Simply stated, the government here did not use technology to obtain information from within a constitutionally protected area to which it was not invited.

Whether the unlawful acts herein were seen by the informant's eyes or by an electronic camera, the acts were no less incriminating and the admissibility of evidence related to such acts should not be dependent on whether the method of recording such evidence was physical or electronic where it is conceded that the State's actor was present by invitation, where the unlawful acts were freely and openly performed before him, and where there is no dispute that a warrant was not needed for the government actor to be in the position to see such acts. The same is true for that which was heard by the informant's ears. In this case, the only question regarding recordation should be accuracy, not admissibility. How the majority reasons that one form of image and sound recordation inculpates a constitutional prohibition and the other does not is legally unintelligible. Under both the Federal and State Constitutions, the means of recordation herein do not themselves constitute a "search" and "seizure" distinct from what the State's actor is already permissibly recording through his senses without the need for a warrant. As such, the security concerns raised by the Fourth Amendment and its West Virginia counterpart are not at issue. There is no constitutional violation in this case.

## II.

### *"Somewhere Over the Rainbow"* The Majority's Skitter into Judicial Federalism

The majority hinges its dismissal of United States Supreme Court precedent upon a general assertion that the West Virginia Constitution *may* be more protective of individual rights than the Federal Constitution. What is so profoundly disturbing about the majori-

ty's opinion is that the majority would pick such an unworthy case upon which to make such an important statement.

Rather than a reasoned consideration of the jurisprudence of interpreting our State Constitution differently from the Federal Constitution or a reasoned analysis of the specific language of Article III, Section 6, of the West Virginia Constitution, the majority seemingly relegates the state provision to a simple mechanism of convenience to proscribe what the majority feels is improper. The result is that the majority now creates a precedent that whenever a majority of this Court wishes to create rights for a given individual or group, the Court may simply invoke the West Virginia Constitution without so much as a plausible explanation for why such an expansion is then required.

Conceptually, I agree completely with my fellow justices that the West Virginia Constitution may be read differently than the Federal Constitution. The West Virginia Constitution is not a simple redundancy. This Court has the power to impose higher standards than those required by the Federal Constitution if it so chooses. We should not blindly follow lower standards when a reasoned analysis of West Virginia law applied using standardized criteria of review compels us to believe that our Constitution stands for more. Such judicial federalism, however, must not simply spring from a desire by the Court for a given result. We must also approach such judicial federalism with a prudent measure of restraint given that clothing a pronouncement in constitutional garb effectively insulates such a pronouncement from the ordinary processes of representative government and legislative review.

Of the three cases cited by the majority to support its claim that individuals enjoy greater protection under Article III, Section 6 than under the Fourth Amendment, *State ex rel. Carper v. West Virginia Parole Bd.*, 203 W.Va. 583, 509 S.E.2d 864 (1998), *Peters v. Narick*, 165 W.Va. 622, 270 S.E.2d 760 (1980), and *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979), none actually involved these constitutional provisions.[4] Amazingly,

---

4. Neither *State ex rel. Carper v. West Virginia Parole Bd.*, 203 W.Va. 583, 509 S.E.2d 864

(1998), nor the cases cited in footnote 6 thereof, which was relied upon by the majority, dealt

the majority did not mention this Court's prior direction regarding construction of Article III, Section 6. Eighty-five years ago, this Court held:

> The provisions of our constitution relating to unreasonable search and seizure and protecting one accused of a crime from being compelled to a be a witness against himself, being substantially the same as the corresponding provisions of the federal constitution and taken therefrom, should be given a construction in harmony with the construction of federal provisions by the Supreme Court of the United States.

Syl. Pt. 2, *State v. Andrews,* 91 W.Va. 720, 114 S.E. 257 (1922). *See also, State v. Duvernoy,* 156 W.Va. 578, 582, 195 S.E.2d 631, 634 (1973) ("this Court has traditionally construed Article III, Section 6 in harmony with the Fourth Amendment."). As stated by Justice Cleckley, in his treatise on Criminal Procedure in West Virginia, "[w]e have previously acknowledged that the federal and West Virginia constitutions are similar and despite some slight differences in phraseology, these provisions [regarding searches and seizures] should be interpreted consistently." 1 Franklin D. Cleckley, *Handbook on West Virginia Criminal Procedure* at I–201 (1993 & Supp.2004). Justice Cleckley himself applied this principle in *State v. Lacy,* 196 W.Va. 104, 468 S.E.2d 719 (1996), wherein the Court was faced with an argument that the alleged search and seizure violated both Article III, Section 6 and the Fourth Amendment. In analyzing the claims, the Court relied heavily upon Federal Fourth Amendment precedent. Thus, the majority's decision in this matter to depart from construction of Article III, Section 6 in harmony with

Supreme Court decisions construing the Fourth Amendment is a departure from nearly a century of precedent of this Court and the advice and counsel of a former Justice of this Court, a scholar recognized throughout this State as the foremost authority on West Virginia criminal procedure.

Although this Court in *Adkins* deemed our search and seizure provisions as "substantially" the same as the Fourth Amendment, I would argue that the main difference between the two—the use of different conjunctions ("or" versus "and") results in the Federal Constitution actually being more restrictive upon governmental power than the West Virginia Constitution. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, *and* the persons or things to be seized.

(Emphasis added). Conversely, Article III, Section 6, states:

> The rights of the citizens to be secure in their houses, persons, papers and effects, against unreasonable searches and seizures, shall not be violated. No Warrant shall issue except upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, *or* the person or thing to be seized.

(Emphasis added). Thus, for a search and seizure to be constitutional under the Fourth Amendment, there must be a warrant identi-

---

with our Constitution's search and seizure provisions. Instead, *Carper* dealt with the constitutional ex post facto law provision (W.Va. Const. Art. III, § 4), and the cases in the footnote discuss due process and equal protection issues. Likewise, *Peters v. Narick,* 165 W.Va. 622, 270 S.E.2d 760 (1980), involved equal protection issues. *Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859 (1979), involved our constitutional requirements for a thorough and efficient education (W.Va. Const.Art. XII, § 1), equal protection (W.Va. Const.Art. III, § 10), and open courts (W.Va. Const.Art. III, § 17). In discussing equal protection issues, the Court, in *Pauley,* noted that "we may interpret our own Constitution to re-

quire higher standards of protection than afforded by comparable federal constitutional standards." *Pauley,* 162 W.Va. at 679, 255 S.E.2d at 863–4, citing, *Adkins v. Leverette,* 161 W.Va. 14, 19–20, 239 S.E.2d 496, 499 (1977). In *Adkins,* which involved constitutional double jeopardy issues (W.Va. Const.Art. III, § 5), the Court stated "[w]hile it is true that a state may not interpret its constitutional guarantee which is *identical* to a federal constitutional guarantee below the federal level, nothing prevents a state court from equaling or exceeding the federal standard." *Adkins,* 161 W.Va. at 19–20, 239 S.E.2d at 499 (emphasis added).

fying both the place to be searched and the person or things to be seized. Conversely, under our State Constitution, the warrant may issue to search a place or to seize a person or thing. While it is unlikely that the State would seek a warrant to search a place without a corresponding request to seize a person or thing, under our Constitution, it may. Implicit in the constitutional warrant requirement is the existence of a search and seizure. Where there is neither a search nor a seizure by a governmental entity, constitutional warrant requirements are not triggered.

It is our duty when interpreting the supreme law of this State to employ standards and criteria which result in a stable, predictable and reasoned approach to interpreting our State Constitution. Here, the leap to finding a constitutional infraction, without so much as a set of standards to guide the Court or a critical analysis to justify its actions, results in a legal pronouncement which borders on the nonsensical. Any foray by this Court into the use of our State Constitution in a manner fundamentally contrary to that required by the United States Constitution must begin first with a commitment to traditional notions of constitutional interpretation and a framework of standard criteria to be considered, such as:

1. The similarity of protection coverage for the constitutional provisions at issue.

2. A comparison of the specific language of the provisions at issue. The lack of distinctive language should dissuade this Court from proceeding in a distinctive manner.

3. West Virginia precedent.

4. Federal precedent.

5. Constitutional and legislative histories and official commentaries.

6. Accepted or uniform judicial interpretations of unique phrases.

7. Differences in the extent and type of interests which the Federal and the West Virginia provisions are designed to protect.

This is by no means an all-inclusive list for the Court to consider. Rather, it is a beginning to a framework of standards to lead the Court to a reasoned approach to interpretation which produces a legitimate basis for a differing constitutional judgment rather than a reactive, incoherent and confusing judgment. Such an approach is positively necessary to supply judges, lawyers, governmental actors and citizens with the guidance necessary to understand their constitutional commitments.

## III.

## Search and Seizure—Why Couldn't the Majority Just *"Follow the Yellow Brick Road"* and Our Own Long–Accepted Law

The ultimate measure of the Fourth Amendment and our State constitutional equivalent is reasonableness. The reasonableness of a search is determined by assessing, on the one hand, the degree, if any, to which the search intrudes upon an individual's security, and on the other hand, the degree to which it is needed for the promotion of a legitimate governmental interest. The Fourth Amendment is unique in being the only amendment within our Bill of Rights which involves the concept of reasonableness and, thereby, a balancing of interests. With the challenges posed by new and current technologies which give the State new powers to intrude and criminals new abilities to evade, this Amendment necessarily requires a grounding by courts in the bedrock of solid constitutional analysis.

I accept that in today's world, the State may muster an awesome array of technology to assist it to hear what cannot be detected with the naked ear and to see what cannot be seen by the naked eye. Sophisticated gadgetry which can be brought to bear by the State includes parabolic microphones, satellite cameras, high tech lenses from planes circling overhead, laser beams bounced off windows, and a wide variety of stand-alone bugging devices. The use of such technology may indeed be the ultimate insult to the security of one's home and may well implicate the protections of the Fourth Amendment and Article III, Section 6, of the West Virginia Constitution. In this case, however, no such devices were in use. Indeed, there was no "search" or "seizure" whatsoever by any form of technological innovation by the

State. The electronic devices at issue were simple passive recording devices. Any "search" or "seizure" was accomplished by the State's informant whose presence was invited by Mullens. "Unless the government activity is either a search or a seizure, it is not regulated by the Fourth Amendment [or Article III, Section 6], and therefore it does not have to be reasonable." Cleckley, *supra* at I–203. There simply was no warrant requirement in this case. No amount of superficial constitutional analysis alters this legal reality.

To understand whether a search or seizure has taken place, we must first look to how those terms have been defined for constitutional purposes. According to the Supreme Court, a Fourth Amendment " 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1983). It has also been observed that:

> A **search** is an examination of a man's house or other buildings or premises, or of his person, with a view that the discovery of contraband or illicit or stolen property, or some evidence of guilt to be used in the prosecution of a criminal action for some crime or offense with which he is charged.... It is important to observe that the definition of **search** must be tied to the expectation of privacy. Thus, where there is no intrusion on the expectation of privacy, there is no search.

Cleckley, *supra* at I–203 (internal quotation and citations omitted) (emphasis in original). As stated by Justice Scalia, "a Fourth Amendment search does *not* occur-even when the explicitly protected location of a *house* is concerned-unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.' " *Kyllo v. United States*, 533 U.S. 27, 33, 121 S.Ct. 2038, 2042–3, 150 L.Ed.2d 94 (2001) (emphasis in original), *quoting, California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.E.2d 210 (1986). Likewise, this Court recognized in *Wagner v.*

*Hedrick,* 181 W.Va. 482, 383 S.E.2d 286 (1989), that

> A claim of protection under the Fourth Amendment and the right to challenge the legality of a search depends not upon a person's property right in the invaded place or article of personal property, but upon whether the person has a legitimate expectation of privacy in the invaded place or thing. If a person is in such a position that he cannot reasonably expect privacy, a court may find that an unreasonable Fourth Amendment search has not taken place.

*Wagner,* 181 W.Va. at 487, 383 S.E.2d at 291 (internal footnote and citations omitted). A "seizure" of property, on the other hand, "occurs when there is some meaningful interference with an individual's possessory interests" in property seized. *Jacobsen,* 466 U.S. at 113, 104 S.Ct. at 1656.[5] *See also,* Cleckley, *supra* at I–203–04.

Former Justice Cleckley, succinctly described the distinction between "search" and "seizure" by stating:

> a seizure may occur without a search, and a search may occur without a seizure. As Justice Stevens explained in his concurring opinion in *Texas v. Brown*, 460 U.S. 730, 747–48, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983):
>
>> Although our Fourth Amendment cases sometimes refer indiscriminately to searches and seizures, there are important differences between the two.... The Amendment protects two different interests of the citizen—the interest in retaining possession of property and the interest in maintaining personal privacy. A seizure threatens the former, a search the latter.

Cleckley, *supra* at I–205. Before constitutional protections can be triggered in the instant matter, a determination must be made that Mullens had a reasonable expectation of privacy in conducting an illegal sale of drugs. In light of the overwhelming mountain of authority relevant to this issue, I simply cannot find that Mullens had a reasonable expec-

---

5. A "seizure" of a person involves the "meaningful interference, however brief, with an individual's freedom of movement." *Jacobsen,* 466 U.S. at 114, n. 5, 104 S.Ct at 1656, n. 5.

tation of privacy triggering protection by the Fourth Amendment or Article III, Section 6.

## IV.

### *"The Great Oz has spoken—Pay No Attention to the Man Behind the Curtain "* and His Absence of Law

In today's world, the right to be left alone in one's home is a valuable right—one truly worthy of earnest protection by myself and my fellow judges. In view of the broad notions of individual liberty and security which underlie our sense of freedom, potent constraints on overreaching governmental intrusions are appropriate. " 'The Fourth Amendment of the *United States Constitution,* and Article III, Section 6 of the *West Virginia Constitution* protect an individual's reasonable expectation of privacy.' Syl. pt. 7, *State v. Peacher,* 167 W.Va. 540, 280 S.E.2d 559 (1981)." Syl. Pt. 1, *Wagner.* The scope of what constitutes an individual's reasonable expectation of privacy has developed over time. Until the majority's opinion in this matter, this Court has historically looked to and embraced the decisions of the United States Supreme Court with respect to the Fourth Amendment when addressing the constitutionality of an alleged search and seizure. As shown below, prior to the instant decision, this Court has consistently relied upon federal precedent when determining what constitutes a constitutionally protected reasonable expectation of privacy.

The majority hinges its brief constitutional analysis on the location of the defendant at the time his illegal activity was recorded—his home. It has been noted that "the home is entitled to special protection as the center of the private lives of our people. Security of the home must be guarded by the law in a world where privacy is diminished by enhanced surveillance and sophisticated communication systems. As is well established, however, Fourth Amendment protection,..., is in essence a personal right." *Minnesota v. Carter,* 525 U.S. 83, 99, 119 S.Ct. 469, 478, 142 L.Ed.2d 373 (1998) (Kennedy, J., concurring). As a personal right, the expectation of privacy provided by the Fourth Amendment, may be extinguished by a person's own actions. The United States Supreme Court

has consistently "held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland,* 442 U.S. 735, 743–4, 99 S.Ct. 2577, 2582, 61 L.Ed.2d 220 (1979) (citations omitted). Similarly, the Supreme Court has noted that the Fourth Amendment does not protect "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Hoffa v. United States,* 385 U.S. 293, 302, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966).

In *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Supreme Court noted "the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, *even in his own home or office,* is not a subject of Fourth Amendment Protection." *Katz,* 389 U.S. at 351, 88 S.Ct. at 511 (citations omitted) (emphasis added). Relying upon this principle, this Court has previously recognized that areas which are constitutionally protected can "not be resolved by a geographic or property analysis" but must turn upon a reasonable expectation of privacy. *State v. Weigand,* 169 W.Va. 739, 742, 289 S.E.2d 508, 510 (1982). *See also, State v. Schofield,* 175 W.Va. 99, 105, 331 S.E.2d 829, 836 (1985) (citing *Katz* for proposition that "Fourth Amendment protects people, not places" while discussing legitimate expectation of privacy under Fourth Amendment and Article III, Section 6); *Peacher,* 167 W.Va. at 563–4, 280 S.E.2d at 575–6 (noting that in order to receive constitutional protection a person "must have a reasonable expectation of privacy that has been invaded by official action" and that the "fact that some warrantless actions by the police do not amount to a substantial invasion of a defendant's reasonable expectation of privacy is the basis upon which some of the exceptions to the warrant requirement have been built."). Accordingly, the majority's emphasis on Mullens' home as the location of the illegal drug sale is misplaced. The proper analysis is upon whether Mullens had a legitimate or reasonable expectation of privacy in the illegal transaction.

The scope of privacy that a person can expect under the Fourth Amendment and a

person's ability to waive the same began to crystallize under federal law in the mid-twentieth century. In 1966, the United States Supreme Court held, in *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), that the Fourth Amendment is not violated when the government, without a warrant, sends an undercover agent into a defendant's home to make a purchase of illegal narcotics.[6] Therein, the Supreme Court stated:

During neither of his visits to petitioner's home did the agent see, hear, or take anything that was not contemplated, and in fact intended, by petitioner as a necessary part of his illegal business. Were we to hold the deceptions of the agent in this case constitutionally prohibited, we would come near to a rule that the use of undercover agents in any manner is virtually unconstitutional *per se* .... The fact that the undercover agent entered petitioner's home does not compel a different conclusion. Without question, the home is accorded the full range of Fourth Amendment protections. See *Amos v. United States*, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921); *Harris v. United States*, 331 U.S. 145, 151, n. 15, 67 S.Ct. 1098, 1102, 91 L.Ed. 1399 (1947). But when, as here, the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street. A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant.

*Lewis*, 385 U.S. at 210–11, 87 S.Ct. at 427, 17 L.Ed.2d at 316. That same year, in *Hoffa*, the Supreme Court found that incriminating statements made to a confidential informant in the privacy of a defendant's hotel room likewise were not protected by the Fourth Amendment's guarantee against warrantless searches and seizures.[7] Thus, the confiden-

tial informant could testify regarding the same. Justice Stewart, writing for the majority, noted:

The argument is that Partin's failure to disclose his role as a government informer vitiated the consent that the petitioner gave to Partin's repeated entries into the suite, and that by listening to the petitioner's statements Partin conducted an illegal 'search' for verbal evidence.

. . . . .

Where the argument fails is in its misapprehension of the fundamental nature and scope of Fourth Amendment protection. What the Fourth Amendment protects is the security a man relies upon when he places himself or his property within a constitutionally protected area, be it his home or his office, his hotel room or his automobile. There he is protected from unwarranted governmental intrusion. And when he puts something in his filing cabinet, in his desk drawer, or in his pocket, he has the right to know it will be secure from an unreasonable search or an unreasonable seizure.

. . . . .

In the present case, however, it is evident that no interest legitimately protected by the Fourth Amendment is involved. It is obvious that the petitioner was not relying on the security of his hotel suite when he made the incriminating statements to Partin or in Partin's presence. Partin did not enter the suite by force or by stealth. He was not a surreptitious eavesdropper. Partin was in the suite by invitation, and every conversation which he heard was either directed to him or knowingly carried on in his presence. The petitioner, in a word, was not relying on the security of the hotel room; he was relying upon his misplaced confidence that Partin would not reveal his wrongdoing.

. . . . .

Neither this Court nor any member of it has ever expressed the view that the

---

6. Surprisingly, the majority opinion does not mention *Lewis*.

7. The Supreme Court likewise found the defendant's rights under the Fifth and Sixth Amendments were not violated.

Fourth Amendment protects a wrong-doer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it. Indeed, the Court unanimously rejected that very contention less than four years ago in *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462.

. . . . .

In the words of the dissenting opinion in *Lopez*, "The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak." *Id.*, 373 U.S. at 465, 83 S.Ct. 1381. *See also Lewis v. United States, ante* p. 206, 87 S.Ct. 424.

*Hoffa*, 385 U.S. at 300–03, 87 S.Ct. at 413–14 (internal footnotes omitted).

In the *Lopez* decision, referenced in *Hoffa*, the Supreme Court found that the warrantless recording of conversations between an IRS agent and the defendant which were made in the defendant's office and without the defendant's knowledge did not violate the Fourth Amendment. *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1962). The recordings evidenced the defendant attempting to bribe the IRS agent. Noting that the defendant had consented to the agent's presence in his office and that the agent could properly testify regarding the conversations, the Supreme Court found admission of the recordings provided the most reliable evidence of what had actually occurred. *Lopez*, 373 U.S. at 439, 83 S.Ct. at 1388. *See also, On Lee v. United States*, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1953) (testimony by a government agent regarding conversation overheard on electronic transmission device between undercover agent wearing microphone and defendant was admissible and did not violate the Fourth Amendment where defendant consented to undercover agent's presence and voluntarily spoke with him).

Subsequently, the Supreme Court appeared to restrict the government's ability to conduct warrantless electronic surveillance in *Katz*. In *Katz*, the Supreme Court found the use of an electronic listening and recording device attached to the outside of a telephone booth commonly used by the defendant to place illegal bets violated his Fourth Amendment right to be protected against warrantless searches and seizures. Significant to the holding in *Katz* was that the defendant had taken steps to insure the privacy of his conversation by closing the telephone booth door and shielding his communication from the public.[8] *Id.*, 389 U.S. at 352, 88 S.Ct. at 511–2. In his oft cited *Katz* concurrence, Justice Harlan eloquently explained:

> As the Court's opinion states, "the Fourth Amendment protects people, not places." The question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a "place." My understanding of *the rule that has emerged from prior decisions* is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable." Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the "plain view" of outsiders are not "protected" because no intention to keep them to himself has been exhibited.

*Id.*, 389 U.S. at 361, 88 S.Ct. at 516 (emphasis added). Interestingly, the majority mentions *Katz* only to the extent it is cited in a law review article attacking *White* and arguing that *Katz* announced a "doctrinal shift."

In *White*, the Supreme Court held that the Fourth Amendment was not violated when a confidential informant secretly recorded conversations with the defendant, including a conversation occurring in the defendant's own home. Justice White, writing for the plurality, explained the impact of *Katz* in

---

8. Also noted was that, based on the facts known to the government at the time the listening device was installed, a warrant authorizing such surveil-lance could have easily been obtained. *Id.*, 389 U.S. at 354, 88 S.Ct. at 513.

light of the Supreme Court's prior precedent as follows:

> Until *Katz v. United States,* neither wiretapping nor electronic eavesdropping violated a defendant's Fourth Amendment rights "unless there has been an official search and seizure of his person, or such a seizure of his papers or his tangible material effects, or an actual physical invasion of his house 'or curtilage' for the purpose of making a seizure." *Olmstead v. United States,* 277 U.S. 438, 466, 48 S.Ct. 564, 72 L.Ed. 944 (1928); *Goldman v. United States,* 316 U.S. 129, 135–136, 62 S.Ct. 993, 86 L.Ed. 1322 (1942).

> . . . . .

> The Court of Appeals understood *Katz* to render inadmissible against White the agents' testimony concerning conversations that Jackson broadcast to them. We cannot agree. *Katz* involved no revelation to the Government by a party to conversations with the defendant nor did the Court indicate in any way that a defendant has a justifiable and constitutionally protected expectation that a person with whom he is conversing will not then or later reveal the conversation to the police.

> *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), which was left undisturbed by *Katz,* held that however strongly a defendant may trust an apparent colleague, his expectations in this respect are not protected by the Fourth Amendment when it turns out that the colleague is a government agent regularly communicating with the authorities. In these circumstances, "no interest legitimately protected by the Fourth Amendment is involved," for that amendment affords no protection to "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Hoffa v. United States,* at 302, 87 S.Ct. 408. No warrant to "search and seize" is required in such circumstances, nor is it when the Government sends to defendant's home a secret agent who conceals his identity and makes a purchase of narcotics from the accused, *Lewis v. United States,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), or when the same agent, unbeknown to the defendant, carries electronic equipment to record the defendant's words and the evidence so gathered is later offered in evidence. *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963).

*White,* 401 U.S. at 748–9, 91 S.Ct. at 1124–5.[9] *See also, United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979) (embracing *White* and *Lopez* to find that tape recordings made by IRS agent without defendant's knowledge which evidenced bribery attempt did not violate defendant's Fourth Amendment rights). In light of this precedent, the Supreme Court applied a reasonable expectations analysis to the possibility of an informant electronically recording interactions with the defendant and stated:

> If the law gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent, neither should it protect him when that same agent has recorded or transmitted the conversations which are later offered in evidence to prove the State's case. *See Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963).

> Inescapably, one contemplating illegal activities must realize and risk that his companions may be reporting to the police. If he sufficiently doubts their trustworthiness, the association will very probably end or never materialize. But if he has no doubts, or allays them, or risks what doubt he has, the risk is his. In terms of what his course will be, what he will or will not do or say, we are unpersuaded that he would distinguish between probable informers on the one hand and probable informers with transmitters on the other. Given the possibility or probability that one of his colleagues is cooperating with the police, it is only speculation to assert

---

**9.** As noted by Justice White in his *Katz* concurrence, *Hoffa* and *Lopez* were left undisturbed by the decision in *Katz. Katz,* 389 U.S. at 363, 88 S.Ct. at 517. I would also point out that the majority in *Katz* relied upon *Lopez* and *Lewis* in reaching its decision. *Id.* at 351–2, 88 S.Ct. at 511.

that the defendant's utterances would be substantially different or his sense of security any less if he also thought it possible that the suspected colleague is wired for sound. At least there is no persuasive evidence that the difference in this respect between the electronically equipped and the unequipped agent is substantial enough to require discrete constitutional recognition, particularly under the Fourth Amendment which is ruled by fluid concepts of 'reasonableness.'

Nor should we be too ready to erect constitutional barriers to relevant and probative evidence which is also accurate and reliable. An electronic recording will many times produce a more reliable rendition of what a defendant has said than will the unaided memory of a police agent. It may also be that with the recording in existence it is less likely that the informant will change his mind, less chance that threat or injury will suppress unfavorable evidence and less chance that cross-examination will confound the testimony.

*White*, 401 U.S. at 752–3, 91 S.Ct. at 1126–7.[10] Once a private information is revealed to another, the person revealing that information "assumes the risk that his confidant will reveal that information to the authorities[.] ... Once frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now-nonprivate information." *Jacobsen*, 466 U.S. at 117, 104 S.Ct. at 1658. Similarly, there is no "constitutional right to rely on possible flaws in the [confidential informant's] memory, or to challenge the [confidential informant's] credibility without being beset by corroborating evidence that is not susceptible of impeachment." *Caceres*, 440 U.S. at 750, 99 S.Ct. at 1470, *quoting Lopez.*

Neither *White* nor *Katz* nor subsequent decisions indicate that *Katz* was the retreat from prior Fourth Amendment jurisprudence suggested by the majority. To the contrary, *Katz* may best be seen as a succinct articulation of the Fourth Amendment standards developed over the years—that the Fourth Amendment protects a defendant's legitimate expectation of privacy in those things he does not willingly reveal to third persons. For if there is a voluntary revelation to third persons, a defendant does not have a legitimate or reasonable expectation that the third person will not reveal what he has seen or heard to authorities. Summarizing post-*Katz* decisions, the Supreme Court in *Smith* stated:

Consistently with *Katz*, this Court uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a "justifiable," a "reasonable," or a "legitimate expectation of privacy" that has been invaded by government action.... This inquiry, as Mr. Justice Harlan aptly noted in his *Katz* concurrence, normally embraces two discrete questions. The first is whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy,"-whether, in the words of the *Katz* majority, the individual has shown that "he seeks to preserve [something] as private." The second question is whether the individual's subjec-

---

**10.** Justice Black concurred in the *White* judgment, but for the reasons set forth in his *Katz* dissent. In his *Katz* dissent, Justice Black stated:

If I could agree with the Court that eavesdropping carried on by electronic means (equivalent to wiretapping) constitutes a 'search' or 'seizure,' I would be happy to join the Court's opinion.

. . . . .

My basic objection is twofold: (1) I do not believe that the words of the Amendment will bear the meaning given them by today's decision, and (2) I do not believe that it is the proper role of this Court to rewrite the Amendment in order 'to bring it into harmony with the times' and thus reach a result that many people believe to be desirable.

*Katz*, 389 U.S. at 364, 88 S.Ct at 518 (Black, J., dissenting). Recognizing that the language of the Fourth Amendment requires a "search" or a "seizure" of a tangible item, Justice Black noted "[a] conversation overheard by eavesdropping, whether by plain snooping or wiretapping, is not tangible and, under the normally accepted meanings of the words, can neither be searched nor seized." *Id*. 389 U.S. at 365, 88 S.Ct. at 519. He went on to articulate his belief that if the Framers of the Constitution intended to require a warrant for eavesdropping, which is what wiretapping is in essence, they would have included language to that effect in the Fourth Amendment. *Id*. 389 U.S. at 365-7, 88 S.Ct. at 519.

tive expectation of privacy is "one that society is prepared to recognize as 'reasonable,' "-whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is "justifiable" under the circumstances.

*Smith*, 442 U.S. at 740, 99 S.Ct. at 2580. *See also, Bond v. United States*, 529 U.S. 334, 338, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000) (recognizing that the Fourth Amendment requires that an individual exhibit an actual expectation of privacy and that society be prepared to recognize such an expectation as reasonable).

The Supreme Court has specifically addressed the scope of the Fourth Amendment in relation to searches of the home twice in recent history. In *Kyllo*, a 2001 decision, the Supreme Court found that the warrantless use of thermal imaging to detect heat sources within a home violated the Fourth Amendment. Therein, the Supreme Court recognized that a Fourth Amendment search occurs only where "the government violates a subjective expectation of privacy that society recognizes as reasonable" even where the location of the "search" is a person's home. *Kyllo*, 533 U.S. at 33, 121 S.Ct. at 2042–3. Justice Scalia, writing for the majority, reasoned:

> We have said that the Fourth Amendment draws "a firm line at the entrance to the house," *Payton*, 445 U.S., at 590, 100 S.Ct. 1371. That line, we think, must be not only firm but also bright-which requires clear specification of those methods of surveillance that require a warrant. While it is certainly possible to conclude from the videotape of the thermal imaging that occurred in this case that no "significant" compromise of the homeowner's privacy has occurred, we must take the long view, from the original meaning of the Fourth Amendment forward.
>
> > "The Fourth Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interests as well as the interests and rights of individual citizens." *Carroll v. United*

> > *States*, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 (1925).
>
> Where, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a "search" and is presumptively unreasonable without a warrant.

*Id.*, 533 U.S. at 40, 121 S.Ct. at 2046. In his dissent, Justice Stevens, joined by Chief Justice Rehnquist, Justice O'Connor and Justice Kennedy, relied upon the well-established principle that there is no Fourth Amendment protection for that which a person knowingly exposes to the public to find a constitutional violation had not occurred because the thermal imaging equipment was simply recording that (heat) which was escaping from the house. *Id.*, 533 U.S. at 42–3, 121 S.Ct. at 2047–8 (Stevens, J., dissenting). Notwithstanding the legitimacy of the dissenters' reasoning, the majority opinion in *Kyllo* does not constitute a retreat from prior Fourth Amendment analysis. *Kyllo* did not involve a defendant who, as in the instant matter, willingly invited a third party into his house thereby extinguishing any privacy interest in that which was exposed to the invitee.

Last year, the Supreme Court was confronted with the issue of whether the Fourth Amendment requires a warrant to search a home where one occupant consents to the search over the objection of a physically present co-occupant. In reaching its decision, the Supreme Court found that "in balancing the competing individual and government interests entailed by the bar to unreasonable searches, the cooperative occupant's invitation adds nothing to the government's side to counter the force of an objecting individual's claim to security against the government's intrusion into his dwelling place." *Georgia v. Randolph*, 547 U.S. 103, 114–15, 126 S.Ct. 1515, 1523, 164 L.Ed.2d 208 (2006). Thus, the Supreme Court held that the police cannot justifiably rely upon the consent of one occupant over the objection of another to conduct a warrantless search of a shared dwelling. *Randolph*, 547 U.S. at 118–19, 126 S.Ct. at 1526. In his dissenting opinion joined by

Justice Scalia, Chief Justice Roberts relied upon prior waiver cases, such as *White*, to find the consent of the co-occupant was sufficient to permit a warrantless search because "the risk assumed by a joint occupant is comparable to the risk assumed by one who reveals private information to another....if he shares the information—or the house—with another, that other can grant access to the police in each instance." *Id.,* 547 U.S. at 134, 126 S.Ct. at 1535. What *Randolph* makes clear is that the ability to consent to a Fourth Amendment search or waive a privacy interest protected by the Fourth Amendment belongs to the defendant. Where the defendant waives his privacy interest, the Fourth Amendment (or Article III, Section 6) is not implicated. However, where a third party attempts to extinguish the defendant's privacy interest independent of any consent or waiver by the defendant and over the defendant's objection, greater scrutiny is applied.

This Court embraced and adopted the reasoning set forth in *Katz, Lewis, Lopez, Hoffa* and *White* in 1982 in the *Blackburn* decision, a decision relegated to a footnote by the majority. Though faced with a warrantless recording of a telephone conversation with the consent of an informant, the Court framed the question before it as "whether our state constitution prohibits surreptitious warrantless monitoring of a defendant's conversation by law enforcement officers in cooperation with a consenting informant." *Blackburn,* 170 W.Va. at 105, 290 S.E.2d at 31. This broadening of the question presented suggests the scope of *Blackburn* is not as narrow as the majority suggests herein. The majority attempts to limit *Blackburn* to telephone conversations. Majority, p. 188, n. 46. The facts in *Blackburn* imply, though do not specifically state, that the defendant therein may have been in his home when he received the telephone call from the informant which was then recorded by police. *Blackburn,* 170 W.Va. at 102, 290 S.E.2d at 29. In analyzing this issue, Justice McGraw, writing for the Court looked to the relevant federal decisions and stated:

The plurality opinion in *White* held that the decision in *Katz* did not apply to surveillance in which the government obtained access to the conversation of the defendant by the consent of another party to the conversation. The plurality noted that previous decisions of the Court, which were left undisturbed by *Katz*, had held that there was no violation of the defendant's Fourth Amendment rights or necessity to obtain a search warrant where the person before whom the defendant made incriminating statements or performed criminal acts was, unknown to the defendant, a government agent who later testified against the defendant at trial, *Hoffa v. U.S.,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *Lewis v. U.S.,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966); or where a government agent, unknown to the defendant, carried electronic equipment to record the defendant's conversation for use against him at trial. *Lopez v. U.S.,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963).

The *White* plurality noted that the rationale in *Hoffa, Lewis* and *Lopez* had been that an individual has no justifiable or constitutionally protected expectation of privacy in incriminating statements he confides to another person under the belief that the other person will not then or later reveal the contents of the conversation to the police.

170 W.Va. at 103–4, 290 S.E.2d at 30. After noting its approval of the *White* decision, *Id.,* 170 W.Va. at 105, 290 S.E.2d at 32, this Court held "[w]arrantless electronic recording of a defendant's conversation with the consent of a participant who, unknown to the defendant, is acting in concert with the police does not violate the prohibition against unreasonable searches and seizures contained in article 3, section 6 of our state constitution." Syl. Pt. 4, *Blackburn.* The *White* decision was also embraced by this Court in *Andriotto,* which also involved a recording of a telephone conversation initiated by an informant to the defendant. *Andriotto,* 167 W.Va. at 508, 280 S.E.2d at 136 (1981).[11]

---

11. As in *Blackburn,* the opinion in *Andriotto* does not disclose the location of the defendant at the time he received the telephone call from the informant.

While implicitly finding *White* not relevant to an analysis under Article III, Section 6, the majority does not address (or acknowledge) this Court's prior reliance upon *White* in *Blackburn*, a decision involving Article III, Section 6. Instead, the majority abruptly overrules *Thompson* as based upon a "complete lack of analysis". Majority, p. 189. However, a fair reading of *Thompson* reveals that it incorporated the reasoning set forth in *Blackburn* as the basis of its decision because, in the words of Justice Brotherton, defendant's situation, in *Thompson*, "falls within the principle [announced] in *Blackburn*". *Thompson*, 176 W.Va. at 305–6, 342 S.E.2d at 273–4. Arguably, if *Thompson* incorporates the *Blackburn* analysis, the majority should also have overruled *Blackburn* in order to achieve a consistency in West Virginia law on this issue.[12]

In reaching its conclusion that the informant's recording of the illegal drug transaction violated Mullens' rights under our Constitution, the majority failed to conduct the "reasonableness" analysis directed by our precedent. In Syllabus Point 1 of *State v. Angel*, 154 W.Va. 615, 177 S.E.2d 562 (1970), this Court held that "[t]he State and Federal Constitutions prohibit only unreasonable searches and seizures and there are numerous situations in which a search and seizure warrant is not needed, . . ., things that are obvious to the senses, . . ., as well as searches and seizures made that have been consented to." Syl. Pt. 1, in part, *Angel*. *See also, State v. Smith*, 158 W.Va. 663, 671, 212 S.E.2d 759, 764 (1975), *overruled on other grounds by State ex rel. White v. Mohn*, 168 W.Va. 211, 283 S.E.2d 914 (1981), (noting "[t]here is no constitutional inhibition against a warrantless search. Both the federal and state constitutions protect only against an unreasonable search."). Looking to federal law for guidance in addressing exceptions to the warrant requirement of Article III, Section 6, and the reasonableness standard, Justice Cleckley in *Lacy* explained:

There is no question but that activities which take place within the sanctity of the home merit the most exacting Fourth Amendment protection. In *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639, 651 (1980), the United States Supreme Court stated: "It is a 'basic principle of Fourth Amendment Law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Conversely, the search of a home for evidence of a crime generally is not unreasonable if it is conducted pursuant to a search warrant supported by probable cause. Of course, under the Fourth Amendment, searches conducted outside the judicial process, without prior approval, may be constitutional if the search and seizure can be justified under one of the well-delineated exceptions or where both exigent circumstances and probable cause exist. *See Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967); *State v. Buzzard*, 194 W.Va. 544, 549, 461 S.E.2d 50, 55 (1995). *See also* Syl. pts. 1 & 2, *State v. Moore*, 165 W.Va. 837, 272 S.E.2d 804 (1980), *overruled in part on other grounds State v. Julius*, 185 W.Va. 422, 408 S.E.2d 1 (1991). It is equally clear that the Fourth Amendment applies only to unreasonable searches and seizures. Indeed, the touchstone of the Fourth Amendment's promise is "reasonableness," which generally, though not always, translates into a warrant requirement. *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 651–55, 115 S.Ct. 2386, 2390–91, 132 L.Ed.2d 564, 573–75 (1995). What is reasonable " 'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.' " *Skinner v. Railway Labor Executives' Assoc.*, 489 U.S. 602, 619, 109 S.Ct. 1402, 1414, 103

---

**12.** I would also question the continued viability of *Andriotto* in light of the majority's decision in this matter as *Andriotto* specifically relied upon *White*. Additionally, as the majority recognized that under *State v. Dillon*, 191 W.Va. 648, 447 S.E.2d 583 (1994), and *State v. Williams*, 215 W.Va. 201, 599 S.E.2d 624 (2004), "the one party consent exception of the Act permits the police to equip an informant with an electronic surveillance device and, without a warrant, send the informant into the home of a suspect", the continued viability of these decisions is suspect. For consistency, the majority should have also overruled these decisions if, in fact, they authorize what the majority now deems unconstitutional.

L.Ed.2d 639, 661 (1989). (Citation omitted). Courts are required to "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110, 118 (1983). In each case, it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. *See Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979).

Ultimately, the question of whether a particular search or seizure is reasonable for purposes of the Fourth Amendment is not a question of fact. Unlike a determination of "reasonableness" in ordinary tort cases and some other contexts, this balancing process presents a question of law.

*Lacy*, 196 W.Va. at 111–2, 468 S.E.2d at 726–7 (footnotes omitted). In determining whether a search is reasonable, this Court has explained that to assert a constitutional violation one "must demonstrate a 'reasonable expectation of privacy' in the subject of the seizure. That expectation is to be measured both subjectively and by an objective standard of reasonableness." *Marano v. Holland*, 179 W.Va. 156, 163, 366 S.E.2d 117, 124 (1988), *citing Katz.* This Court has also held, in relation to the reasonable expectation of privacy protected by Article III, Section 6, that "a person has no reasonable expectation of privacy in what he knowingly exposes to the public." Syl. Pt. 3, *State v. Aldridge*, 172 W.Va. 218, 221, 304 S.E.2d 671 (1983).

Upon conducting the constitutionally required examination of a person's reasonable expectation of privacy, it becomes clear that a confidential informant's surreptitious recording of an illegal drug transaction taking place in a defendant's house does not violate either the Fourth Amendment or Article III, Section 6. First, by conducting illegal drug activity in his house, Mullens lowered the expectation of privacy which may ordinarily be afforded to that location by transforming it from a home to a place of business and inviting outsiders in to conduct business. *See Lewis, supra.* He thereafter extinguished any privacy interest he may have had in the activities occurring in his home by inviting the confidential informant in and exposing those activities to the confidential informant's senses. *See Angel, supra.* By publically exposing that which would otherwise reasonably be deemed private to the confidential informant, Mullens gave up any protection which may have been afforded under the Fourth Amendment or Article III, Section 6. *See Aldridge, Hoffa, Katz, Lopez, White, Lewis, Jacobsen, Caceres.* It has long been held that it is not reasonable to assume that matters revealed to a confidant will not later be disclosed to government officials. *See, e.g., Hoffa, Katz, Blackburn.* Thus, Mullens does not have a legitimate, reasonable or justifiable expectation of privacy in the conducting an illegal drug business in his home. Even if a subjectively reasonable expectation of privacy could be found, I simply do not believe it is an expectation that society is prepared to accept as objectively reasonable. Therefore, Mullens did not have a privacy expectation protected by either the Fourth Amendment or Article III, Section 6.

Similarly, I find no constitutionally relevant distinction based upon the fact that the confidential informant electronically recorded the illegal drug transaction. The recordation is simply providing the most accurate version of events, presenting the best evidence and alleviating the possibility of witness intimidation or memory loss. A defendant simply does not have a constitutional right to rely upon a lapse in an informant's memory or to impeach an informant's credibility by prohibiting introduction of corroborating evidence. *See Caceres, Lopez.* As explained by the Third Circuit Court of Appeals after analyzing relevant Supreme Court precedent:

[i]n short, the Court adopted the principle that, if a person consents to the presence at a meeting of another person who is willing to reveal what occurred, the Fourth Amendment permits the government to obtain and use the best available proof of what the latter person could have testified about.

*United States v. Lee*, 359 F.3d 194, 200 (3rd Cir.2004), *cert. denied*, 543 U.S. 955, 125 S.Ct. 408, 160 L.Ed.2d 316 (2004). I have

not heard a credible or persuasive argument to support the exclusion of a verifiable recording of an event when the informant may otherwise testify as to what is represented on the recording. While both our precedent and that of the United States Supreme Court involved audio recordings, the addition of a video recording does not alter the constitutional analysis. Several federal courts of appeals have addressed the use of video recording with an informant's consent and have found the same to be constitutional.

In *United States v. Brathwaite*, 458 F.3d 376 (5th Cir.2006), the Fifth Circuit Court of Appeals found no "constitutionally relevant difference between audio and video surveillance." *Brathwaite*, 458 F.3d at 380.[13] At issue in *Brathwaite* was a Fourth Amendment challenge to a confidential informant's warrantless use of a camera hidden in her purse to video the defendant's counterfeiting activities conducted in his living quarters. The Fifth Circuit found Brathwaite forfeited any privacy interests he may have had in his home when he invited the informant in. The Fifth Circuit reasoned:

> Once Brathwaite invited the CI into his home, he "forfeited his privacy interest in those activities that were exposed to [the CI]." *United States v. Davis*, 326 F.3d 361, 366 (2d Cir.2003), *cert. denied*, 540 U.S. 908, 124 S.Ct. 281, 157 L.Ed.2d 196 (2003); *see also United States v. Lee*, 359 F.3d 194, 201 (3d Cir.2004), *cert. denied*, 543 U.S. 955, 125 S.Ct. 408, 160 L.Ed.2d 316 (2004) ("The principle underlying the governing Supreme Court cases is that if a defendant consents to the presence of a person who could testify about a meeting and is willing to reveal what occurs, the defendant relinquishes any legitimate expectation of privacy with respect to anything . . . the testimony could cover."). The videotape evidence here only depicted what was viewable by the CI, to whose presence Brathwaite consented. *See Davis*, 326 F.3d at 366. "[J]ust as [Brathwaite] gave up any expectation of privacy in the things that he allowed [the CI] to hear, [Brathwaite] also gave up any expec-

tation of privacy in the things that he allowed [the CI] to see." *Lee*, 359 F.3d at 201–02. "Although video surveillance may involve a greater intrusion on privacy than audio surveillance, the difference is not nearly as great as the difference between testimony about a conversation and audio recordings of conversations." *Id.* at 202. Because Brathwaite did not retain a privacy interest in the areas captured by the video surveillance conducted by an invited visitor, we hold that no Fourth Amendment violation occurred. *See Davis*, 326 F.3d at 366.

*Brathwaite*, 458 F.3d at 380–1.

The Second Circuit's *Davis* opinion, *United States v. Davis*, 326 F.3d 361 (2nd Cir. 2003), *cert. denied*, 540 U.S. 908, 124 S.Ct. 281, 157 L.Ed.2d 196 (2003), referenced in *Brathwaite*, involved a video recording of an illegal drug deal in the defendant's home made by virtue of a camera hidden in a confidential informant's jacket. 326 F.3d at 362. Discussing the argued distinction between video and audio recordings, the Second Circuit stated:

> It is firmly established that audio recordings, obtained without a warrant and through hidden recording devices by an invited guest, do not violate the Fourth Amendment. The rationales for permitting warrantless audio recordings, as articulated in *White* and *Lopez*, apply with equal force to the video surveillance at issue in this case. We therefore extend the rule of *White* and *Lopez* to video recordings that capture images visible to a consensual visitor and hold that Davis's Fourth Amendment right to be free from unreasonable searches and seizure was not violated.

*Id.* at 362–3 (internal citations omitted). In reaching its holding that the Fourth Amendment was not violated by the confidential informant's warrantless video taping of activity in the Davis' home, the Second Circuit relied upon the well-established exception to the general rule that warrantless searches are *per se* unreasonable for those things or activities. That exception provides that a

---

**13.** In footnote 4 of *Brathwaite*, the Fifth Circuit noted that this finding was consistent with find-

ings in the Second, Third, Sixth, Eighth, Ninth and Eleventh Circuit Courts of Appeals.

warrant is not required to obtain that which "a person knowingly exposes to the public, even in his own home or office." *Id.* at 365, *quoting Katz.* The Second Circuit explained:

> Once Davis invited [the informant] into his residence, Davis forfeited his privacy interest in those activities that were exposed to [the informant]. We therefore hold that, as with the audio recordings in *Davis* and *Lopez,* the videotape evidence, which merely showed scenes viewable by [the informant], did not violate Davis's Fourth Amendment right to be free from unreasonable searches and seizures. Similar to the audio recording in *Lopez,* [the informant] did not seize anything from Davis without his knowledge. Rather, [the informant] was inside 35 Rose Avenue with Davis's consent and the hidden camera merely memorialized what [the informant] was able to see as an invited guest. Also similar to *Lopez,* the video recording captured only statements and actions that Davis "knew full well could be used against him by [the informant] if he wished." Because the hidden camera did not capture any areas in which Davis retained a privacy interest, no Fourth Amendment violation occurred.

*Id.* at 366, 88 S.Ct. 507.

In *Lee,* an informant rented a hotel suite for the use of the defendant and permitted the FBI, without a warrant, to install audio and video recording equipment in the living room area of the suite prior to the defendant's arrival. *Lee,* 359 F.3d at 199. FBI agents monitored the hallway and turned the equipment on only when the informant was present in the suite with the defendant. *Id.* Now–Justice Alito, writing for the Third Circuit Court of Appeals, rejected an argument that there was a constitutional distinction between an informant's consent to justify warrantless audio recording as opposed to video recording, explaining:

> [W]e remain convinced that the present case is governed by the well-established principle that a person has no legitimate expectation of privacy in conversations with a person who consents to the recording of the conversations.

First, we cannot distinguish this case on the ground that the recorded meetings occurred in a hotel suite. What is significant is not the type of room in which the surveillance occurred but Lee's action in admitting [the informant] to the room. Although Lee had an expectation of privacy in the hotel suite so long as he was alone there, when Lee allowed [the informant] to enter, any expectation of privacy vis-a-vis [the informant] vanished. We note that in *Hoffa* many of the conversations also occurred in a hotel suite, but the Court nevertheless held that the case did not involve any legitimate Fourth Amendment interest. 385 U.S. at 296, 87 S.Ct. 408, 17 L.Ed.2d 374.

Second, we cannot draw a constitutional distinction between consensual audio and video surveillance. The principle underlying the governing Supreme Court cases is that if a defendant consents to the presence of a person who could testify about a meeting and is willing to reveal what occurs, the defendant relinquishes any legitimate expectation of privacy with respect to anything that the testimony could cover. Thus, just as Lee gave up any expectation of privacy in the things that he allowed [the informant] to hear, Lee also gave up any expectation of privacy in the things that he allowed [the informant] to see. Although video surveillance may involve a greater intrusion on privacy than audio surveillance, the difference is not nearly as great as the difference between testimony about a conversation and audio recordings of conversations.

*Id.* at 201–2. The Third Circuit also rejected an argument that the government was required, pursuant to the federal wiretapping statute, 18 U.S.C. § 2518(3)(c), to demonstrate that investigative techniques less intrusive than video surveillance were inadequate noting that the statute was not applicable to "electronic surveillance conducted with the consent of a party to the communication." *Id.* at 203.

Four years prior to the *Lee* decision, the Ninth Circuit Court of Appeals came to a similar conclusion. In *United States v. Nerber,* 222 F.3d 597 (9th Cir.2000), the Ninth

Circuit Court of Appeals addressed the situation where defendants were recorded while in the informants' hotel room both when the informants were present and after the informants had left. In analyzing the matter before it, the Ninth Circuit utilized the legitimate expectation of privacy test outlined in *Smith v. Maryland* and recognized in *Bond*, i.e, that the Fourth Amendment protects only legitimate expectations of privacy—those a defendant subjectively maintains which are also expectations society is willing to accept as reasonable. 222 F.2d at 599. Utilizing this analysis, the Ninth Circuit found:

> The district court did not err in finding that defendants had a subjective expectation not to be videotaped in the hotel room. In addition to closing the door, drawing the blinds, and exercising dominion over the room after the informants left at 10:00 a.m., defendants ingested cocaine and brandished weapons in a way they clearly would not have done had they thought outsiders might see them.

> The objective reasonableness of defendants' privacy expectation presents a closer question. . . . Despite the pause the government's use of video surveillance gives us, we agree with the district court that defendants had no reasonable expectation that they would be free from hidden video surveillance while the informants were in the room.

*Id.* at 603–4. While the Ninth Circuit noted that defendants were in the informants' hotel room, the focus was upon the objective reasonableness of whether the defendants could expect not to be recorded in the presence of the informants.

Although not addressing Fourth Amendment claims, the Ninth Circuit addressed the need for audio and video surveillance in investigating drug crimes in *United States v. Chen*, 979 F.2d 714 (9th Cir.1992). In *Chen*, United States Customs agents discovered a shipment of heroin while it was in transport to a rented warehouse. They obtained a warrant to install a video camera in the warehouse to observe the shipment after delivery. 979 F.2d at 716. However, instead of installing one camera in the warehouse as authorized by the warrant, they installed a second which was removed due to technical difficulties and a third outside the warehouse. *Id.* The district court suppressed all video evidence obtained as a sanction for violating the scope of the warrant issued.[14] The Ninth Circuit reversed. In so doing, it started its

> analysis by pointing out that the district court erred in balancing the interests at stake. The district court properly determined that video surveillance is very intrusive, and that the Chen defendants are entitled to protection under the Fourth Amendment. The district court also correctly pointed out that a business is entitled to less protection from video surveillance than an individual's home. The district court, however, erred by holding that this lessened expectation of privacy is offset because this was merely a "mercantile crime" and there was no immediate threat of violence or harm to persons or property.

> Drug crimes are very serious and represent one of the greatest threats to society. Drug conspiracies are often well-planned, and video and audio surveillance may be necessary because the conspirators often carefully conceal their activities and identities by using code words and other techniques. Therefore, in balancing the interests, the fact that this was a drug crime does not weigh in favor of suppression.

*Id.* at 718 (internal citations omitted). Like the Ninth Circuit, I believe the government's need for accurate recordation of illegal drug activities to bolster the prosecution of the same justifies the use of video as well as audio recordations of criminal transactions. This need, coupled with a defendant's lack of an expectation of privacy when inviting a confidential informant into his home to conduct an illegal drug transaction, is sufficient in this instance to justify warrantless audio

---

14. The government had agreed to the suppression of the video obtained from the camera installed outside the warehouse as exceeding the scope of the warrant. Indeed, upon learning of the installation of this camera the Assistant United States Attorney ordered its removal and notified the district court of its installation.

and video recording of the transaction performed with the informant's consent.

## V.

### *"I've a feeling we're not in Kansas anymore "* The Majority's Misplaced Reliance Upon Other States

The majority spends nearly one-third of its opinion discussing decisions from other state courts in an effort to show support for its decision herein. However, a careful examination of the law in those jurisdictions indicates their support for the majority decision is not as strong as implied. The majority itself begrudgingly acknowledges that two of the decisions upon which it relies were subsequently overruled. One, *People v. Beavers,* 393 Mich. 554, 227 N.W.2d 511 (1975), was overruled by a subsequent decision of the Michigan Supreme Court in *People v. Collins,* 438 Mich. 8, 475 N.W.2d 684 (1991), in which the Michigan court found no justifiable reason to interpret their state constitutional search and seizure provisions differently than under the Federal Constitution. The Michigan Supreme Court embraced the *Lopez, Katz, White* and *Caceres* decisions. The second, *State v. Sarmiento,* 397 So.2d 643 (Fla. 1981), was negated by a subsequent constitutional amendment approved by Florida's citizens in direct response to the *Sarmiento* decision. Upon a recognition that *Beavers* and *Sarmiento* are no longer good law, that leaves four decisions, *Commonwealth v. Blood,* 400 Mass. 61, 507 N.E.2d 1029 (1987), *State v. Glass,* 583 P.2d 872 (Alaska 1978), *Commonwealth v. Brion,* 539 Pa. 256, 652 A.2d 287 (1994), and *State v. Blow,* 157 Vt. 513, 602 A.2d 552 (1991), each quoted at length by the majority, purporting to support the majority decision herein. Each will be discussed in turn.

Nearly three pages of the majority opinion herein is a quote from the Massachusetts Supreme Judicial Court opinion in *Blood.* However, nowhere in the majority opinion is there an acknowledgment that Massachusetts has retreated from the *Blood* decision, though not specifically overruling it. In *Commonwealth v. Rodriguez,* 67 Mass.App. Ct. 636, 855 N.E.2d 1113 (2006), the Massachusetts Supreme Court was faced with an

argument, based upon *Blood,* that the warrantless monitoring of a drug transaction at an informant's apartment with the informant's consent violated the defendant's rights. Explaining *Blood* and subsequent decisions, the Massachusetts Supreme Judicial Court stated:

> The defendant interprets the *Blood* decision as bringing within the protective reach of art. 14 any conversation that takes place in any private home. While there is some language in *Blood* that intimates such a broad reading of art. 14, *id.* at 70, 507 N.E.2d 1029, the facts underlying the decision and the subsequent cases interpreting it make clear that such a conversation is not automatically entitled to constitutional protection merely because of where it occurred.

> In *Blood,* a government informant wore a concealed transmitter during meetings with the two defendants (Blood and Lorenzen) and others involved in a conspiracy to burglarize bars of gold from a commercial establishment. . . . Two of the conversations admitted in evidence had taken place at Lorenzen's home and the third conversation had taken place at the home of Novia Turkette, Jr., . . . The government informant had known Turkette and his father for about fifteen years, and Turkette had posted the informant's bail in the past on unrelated charges.

> Based on these circumstances, the court reasoned that because the conversations at issue were held in private homes and included only friends or close associates, it was reasonable for the participants to expect that what was said would not become more widely known. *Id.* at 68–69, 507 N.E.2d 1029. The court further held that "it is objectively reasonable to expect that conversational interchange in a private home will not be invaded surreptitiously by warrantless electronic transmission or recording." *Id.* at 70, 507 N.E.2d 1029.

> In subsequent decisions involving the warrantless seizure of conversations by electronic surveillance, courts have concluded that the same privacy concerns were not implicated when the circumstances could be distinguished from those present in

*Blood.* For example, ... in *Commonwealth v. Collado*, 42 Mass.App.Ct. 464, 469, 677 N.E.2d 1171 (1997), we held that the defendant "had no reasonable expectation of privacy while he was present in the apartment of an undercover narcotics officer with whom he had negotiated an arm's-length transaction for the sale of drugs"; the defendant and the officer were not "trusted friends," and their interaction was primarily centered on business.

*Rodriguez*, 855 N.E.2d at 1118–9. According to the court in *Rodriguez*, a critical factor in the *Blood* decision was the fact that the informant was a long-time trusted friend of one of the defendants. *Id.* at 1118. Noting the defendant and informant in *Rodriguez* were not close friends or business associates, the court distinguished *Blood*, and found no constitutional violation, explaining:

> In sum, the intercepted conversation exclusively concerned a business transaction, was engaged in by two individuals who were not close friends, and took place in a residence over which the defendant did not have control. The indicia of an expectation of privacy that were present in *Blood*, including lengthy conversations that took place over a period of days at the homes of longtime friends and business associates, are absent here. Here, the defendant lacked a reasonable expectation of privacy and, therefore, is unable successfully to challenge admission of the conversation.

*Id.* at 1120. Similarly, the court rejected a *Blood*-based argument to suppress the warrantless video recording of an illegal drug transaction in a motel room in *Commonwealth v. Price*, 408 Mass. 668, 562 N.E.2d 1355 (1990). Therein the court stated:

> We shall assume that the defendant had an expectation of privacy in his conversations in the motel room. Society is not prepared, however, to accept any such expectation as reasonable. The defendant and his associates were engaged in negotiating a major business transaction with people whom he had just met, and whom his associates had first met the day before.... A viewing of the videotapes shows the transaction was an arm's length one with manifestations of suspicion and distrust.

*Price*, 562 N.E.2d at 1358. In light of these recent decisions from the Massachusetts court, it is clear to me that a critical factor in the *Blood* decision was the status of the informant as a long-time trusted friend and associate of the defendant. It is not clear to me that, if presented with the warrantless recording of a drug transaction in the defendant's home by an informant who does not have a prior relationship with the defendant, the Massachusetts court would reach the same decision as it did in *Blood.*

I read *Glass* somewhat differently than the majority herein. Through the select use of ellipses the majority downplays the significance of Alaska's separate constitutional right to privacy upon its decision. In *Glass*, the Alaska court found "Alaska's specific constitutional provision recognizing a right to privacy which shall not be infringed" to be compelling support for its ruling. *Glass* 583 P.2d at 878. The Alaska court specifically stated "we believe that Alaska's *privacy amendment* prohibits the secret electronic monitoring of conversations upon the mere consent of a participant.... *it is clear that it affords broader protection than the penumbral right inferred by other constitutional provisions.*" *Id.* at 878–9 (emphasis added). Finally, footnote 35 of the *Glass* opinion negates the implication contained in the majority opinion that the home as the location of the recording was significant. Therein, the Alaska court stated, "[w]e have previously recognized the high degree of protection surrounding the home. *We decline to base our holding on this particularized protection,* however, since we have concluded that the right of privacy is infringed by the warrantless participant monitoring of private conversations regardless of the locus of the police surveillance." *Id.* at 881, n. 35 (internal citations omitted) (emphasis added). Accordingly, I do not believe that *Glass* provides significant support for the majority opinion in this matter.

That leaves the *Brion* and *Blow* decisions to support the majority's opinion herein. However, it should be noted that the Pennsylvania Supreme Court has expressly limited *Brion* to in-person meetings occurring in a defendant's home and has refused to re-

quire a prior probable cause determination for the warrantless recording of a telephone call initiated by an informant to the defendant at his home. *Commonwealth v. Rekasie*, 566 Pa. 85, 778 A.2d 624 (2001). Similarly, a lower Pennsylvania court recognized that the Pennsylvania legislature amended Pennsylvania's wiretap statute in response to the *Brion* decision.[15] *Commonwealth v. Fetter*, 770 A.2d 762, 766 (Pa.Super.Ct.2001), *aff'd*, 570 Pa. 494, 810 A.2d 637 (2002). Prior to the majority decision in this matter, the only jurisdiction to rely upon the *Brion* decision in support of a finding that one-party consent to record a conversation in a non-consenting party's home was Vermont in *State v. Geraw*, 173 Vt. 350, 795 A.2d 1219 (2002), wherein the Vermont Supreme Court found that police could not record an interview with a defendant occurring in the defendant's home without the defendant's knowledge.[16] Prior to the majority opinion in this matter, neither *Brion, Geraw* nor *Blow* had been relied upon by any other foreign jurisdiction. As these decisions are contrary to this Court's precedent, the law in the vast majority of states and federal law, I simply do not find them persuasive enough to overrule the established precedent of this State, as was done by the majority herein.

### VI.

### *"Bring Me the Broomstick of the Witch of the West"* Then You'll Get Your Warrant!

I am not convinced that the majority is fully aware of the impact of its decision to require warrants obtained pursuant to the West Virginia Wiretapping and Electronic Surveillance Act (hereinafter "the Act"), W. Va.Code § 62–1D–1, *et seq.*, before an informant records conversations or activities in

the home of another will have upon law enforcement activities in this State. Unlike in Vermont and Pennsylvania, the jurisdictions relied upon by the majority to support its decision, West Virginia narrowly defines who may issue and seek such a warrant.

Under West Virginia law, only members of the State Police, acting through a county prosecutor or duly appointed special prosecutor, may seek a warrant to authorize the in-home recording from one of only five judges. Pursuant to W. Va.Code § 62–1D–8 (1987), the "prosecuting attorney of any county or duly appointed special prosecutor may apply to one of the [five] designated circuit judges referred to in [W. Va.Code § 62–1D–7] and such judge, in accordance with the provisions of [the Act] may grant an order authorizing the interception of wire, oral or electronic communication by an officer of the investigative or law-enforcement agency." To obtain an *ex parte* order authorizing such interception, the application must set forth the member of the State Police making the application and the officer authorizing the application. W. Va.Code § 62–1D–11(a)(1) (1987). Moreover, the Act defines "investigative or law-enforcement officer" as "a member or members of the Department of Public Safety [State Police] who is or are empowered by law to conduct investigations of or to make arrest for offenses enumerated" under the Act. W. Va.Code § 62–1D–2(g) (1987). Reading the Act in its entirety reveals that the State Police may make application through the county prosecutor or special prosecutor for a warrant authorizing the in-home recording of events by an informant, based upon probable cause, to one of five circuit court judges. The Act does not authorize a sheriff, sheriff's deputy or municipal police officer to seek such a

**15.** The 1998 amendment to 18 Pa.C.S. § 5704(2)(iv) (2002) requires a showing of probable cause and one-party consent to a designated judicial officer prior to the interception of an oral communication in the home of a non-consenting party where both consenting and non-consenting parties are physically present in the home at the time of the interception unless both probable cause and exigent circumstances exist.

**16.** Contrary to the representation of this case in the majority opinion, the police officer was not

working undercover. Majority, p. 81, 650 S.E.2d at 180. The court, in *Geraw* described the circumstances presented by stating "The officers identified themselves, and defendant invited them into his residence. They sat down at defendant's kitchen table, where the officers interviewed defendant about his relationship with the minor. Unbeknownst to defendant, the officers secretly tape recorded the conversation." *Geraw*, 795 A.2d at 1220.

warrant or to conduct surveillance pursuant to a duly issued warrant. Further, the Act does not permit any magistrate or the remaining 61 circuit court judges of this State to issue a warrant authorizing the informant's activity.

By contrast, Vermont does not have a wiretapping act. Therefore, warrants to conduct in-home, one-party consent recording would come under law enforcement's normal procedures for obtaining a warrant. The Pennsylvania Wiretapping Act permits any investigative or law enforcement officer to obtain a such a warrant from "the president judge, or his designee who shall also be a judge, of a court of common pleas." 18 Pa.C.S. § 5704(2)(iv). Pennsylvania defines "investigative or law enforcement officer" as "[a]ny officer of the United States, of another state or political subdivision thereof, or of the Commonwealth or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter or an equivalent crime in another jurisdiction, and any attorney authorized by law to prosecute or participate in the prosecution of such offense." 18 Pa.C.S. § 5702.[17] Thus, to the extent these states require warrants to permit a consensual informant to record conversations or activities inside a defendant's home, those warrant requirements do not restrict law enforcement's activities to the extent that the majority opinion in this matter restricts the investigation and prosecution of serious crimes.

I fear the legitimate investigation of illegal drug activity has been severely hampered by the majority in this matter. Informants in drug crimes often have substantial issues which may impact their potential trial testimony—be it credibility issues, intimidation, or fear of retaliation for their testimony. Recordings of an informant's interaction with the defendant provide the best evidence of what actually occurred—evidence not subject to attack by intimidation or credibility issues. This evidence may perhaps now be forever lost as a result of the majority decision in this matter for there may be few opportunities to obtain the needed warrants. And if law enforcement now attempts to use a one-party consent wire to record illegal activity *outside* the home, a drug dealer now would need only to insist that the informant step inside the dealer's residence to complete the sale in order to blow the informant's cover, potentially jeopardizing his or her safety. Given the limited ability to obtain the warrant required by the majority under the Act, I fear this Court has sent the message to drug dealers throughout this State to simply go into your house, call it your home, conduct your illegal business there and law enforcement may not be able to easily stop you.[18]

## VII.

### *"Run, Toto, Run!"* The Majority's Actions *Will* Have Retroactive Effect

I must finally take issue with the majority's comment regarding the retroactive nature of its decision in this matter, a comment relegated to a footnote. The majority herein decided an issue involving a defendant's constitutional right under Article III, Section 6 of our Constitution, finding that he was entitled to the issuance of a warrant based upon probable cause before a government informant who has been invited into his home can passively record the defendant's openly displayed illegal activities. This was not a mere procedural or prophylactic rule. It involved a substantive constitutional right.

In *State v. Blake*, 197 W. Va. 700, 478 S.E.2d 550 (1996), this Court addressed whether the rule announced in *State v. Neuman*, 179 W.Va. 580, 371 S.E.2d 77 (1988), requiring a court to make a determination on the record that a defendant has knowingly,

---

17. Pennsylvania defines "judge" as "[w]hen referring to a judge authorized to receive applications for, and to enter, orders authorizing interceptions of wire, electronic or oral communications pursuant to Subchapter B (relating to wire, electronic or oral communication), any judge of the Superior Court." 18 Pa.C.S. § 5702.

18. This, of course, is not meant to ignore the impact that the sale of drugs from homes will have on neighbors and local businesses. The majority's holding would also seem to be applicable to criminal investigations outside drug enforcement.

voluntarily, and intelligently waived his right of self-incrimination before permitting a defendant to testify in his own behalf should be applied retroactively. In *Blake*, this Court found "that the rule in *Neuman* was merely a procedural/prophylactic rule to guide courts in future proceedings...the *Neuman* requirements, like the *Miranda* warnings, are not constitutional rights themselves but are merely prophylactic standards designed to safeguard the right of every criminal defendant to testify in his or her own behalf." *Blake* 197 W. Va. at 713, 478 S.E.2d at 562. In an effort to guide future retroactivity analyses, the Court held, in Syllabus Point 5 of *Blake* that

> The criteria to be used in deciding the retroactivity of new constitutional rules of criminal procedure are: (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards. Thus, a judicial decision in a criminal case is to be given prospective application only if: (a) It established a new principle of law; (b) its retroactive application would retard its operation; and (c) its retroactive application would produce inequitable results.

Utilizing this analysis, the Court in *Blake* determined that "because *Neuman* clarified applicable procedural law only, and not substantive or constitutional law, it should be given prospective application only. *Id.* at 713, 478 S.E.2d at 563.

In the instant matter, the majority decided a substantive constitutional right. As recently stated by the United States Supreme Court, a new rule decided on constitutional principles applies retroactively "if (1) the rule is substantive or (2) the rule is a watershed rul[e] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Whorton v. Bockting*, — U.S. —, —, 127 S.Ct. 1173, 1181, 167 L.Ed.2d 1 (2007). Due to the substantive nature of the constitutional right found by the majority in this matter, I cannot agree with their statement that the majority's holding does not apply retroactively. It does.

For the reasons set forth herein, I respectfully dissent from the majority opinion in this matter.

MAYNARD, Justice, dissenting:

I am deeply dismayed by the majority's ruling in this case! Rarely has a holding of this Court rested upon such a weak legal and rational foundation as the instant holding.

The bulk of the majority opinion amounts to essentially a concession that its holding is not supported by federal constitutional law, federal statutory law, the majority of state courts or legislatures, West Virginia statutory law, and the precedent of this Court. The majority's novel holding, rather, is based solely on the general observation that this Court has historically drawn a bright line between searches and seizures in the home versus searches and seizures outside the home. Significantly, in reaching this conclusion, the majority overlooks the fact that police informants who are not armed with electronic surveillance devices may enter the home of a suspect to obtain evidence which can then be used against the suspect. As a result, the majority does not have to undertake the impossible task of explaining the constitutional significance between the presence and absence of an electronic surveillance device in an informant's gathering of incriminating evidence.

Let me try to make this clear to the average West Virginian so that he or she will understand the practical implications of the majority opinion. If the police, without a warrant, send an informant into a criminal's house, that informant can write down any illegal acts he or she sees in the house, and later testify in court to his observation of all illegal acts, including all conversations he heard and events he saw, without violating the suspect's constitutional rights. But under the majority opinion, if that same informant enters the suspect's house and *electronically* records conversations, without a warrant first bring obtained, that recorded evidence cannot be used against the criminal. This is the type of nonsense that makes people shake their heads at court decisions.

Also, the majority opinion suffers from overblown rhetoric in its attempt to support its holding. The truth is the impact of permitting electronic surveillance via a confiden-

tial informant does not reach literally into the home of every citizen of our State. To the contrary, it reaches only into the homes of those criminal suspects who speak freely in the company of informants whom they willingly invite into their homes.

Further, the majority's novel holding partially rests on the flawed presumption that law enforcement agents are prone to arbitrarily investigate law-abiding citizens. Cash-strapped and overworked law-enforcement agencies have no incentive to arbitrarily send wired informants into the homes of law-abiding citizens when there are real crimes to investigate. Also, even though police are currently permitted to use informants who are not wired for sound to obtain evidence against a suspect in the suspect's home without first obtaining a search warrant, there simply is no evidence that the police use such a practice to arbitrarily investigate law-abiding citizens. Why then should we presume that the fact that informants are permitted to wear a wire would spawn an orgy of arbitrary police conduct?

In contrast to the majority's spurious analysis is the reasoning of the United States Supreme Court in *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), in which the Court held that the Fourth Amendment was not violated by the failure of the police to obtain judicial authorization to have an informant enter a suspect's home wearing an electronic surveillance device. In *White*, the Court reasoned:

> Our problem ... is what expectations of privacy are constitutionally "justifiable"— what expectations the Fourth Amendment will protect in the absence of a warrant. So far, the law permits the frustration of actual expectations of privacy by permitting authorities to use the testimony of those associates who for one reason or another have determined to turn to the police, as well as by authorizing the use of informants .... If the law gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent, neither should it protect him when that same agent has recorded or transmitted the conversations which are later offered in evidence to prove the State's case.
>
> Inescapably, one contemplating illegal activities must realize and risk that his companions may be reporting to the police.... But if he has no doubts, or allays them, or risks what doubt he has, the risk is his. In terms of what his course will be, what he will or will not do or say, we are unpersuaded that he would distinguish between probable informers on the one hand and probable informers with transmitters on the other. Given the possibility or probability that one of his colleagues is cooperating with the police, it is only speculation to assert that the defendant's utterances would be substantially different or his sense of security any less if he also thought it possible that the suspected colleague is wired. for sound. At least there is no persuasive evidence that the difference in this respect between the electronically equipped and the unequipped agent is substantial enough to require discrete constitutional recognition, particularly under the Fourth Amendment which is ruled by fluid concepts of "reasonableness."
>
> Nor should we be too ready to erect constitutional barriers to relevant and probative evidence which is also accurate and reliable. An electronic recording will many times produce a more reliable rendition of what a defendant has said than will the unaided memory of a police agent. It may also be that with the recording in existence it is less likely that the informant will change his mind, less chance that threat or injury will suppress unfavorable evidence and less chance that cross-examination will confound the testimony. Considerations like these obviously do not favor the defendant, be we are not prepared to hold that a defendant who has no constitutional right to exclude the informer's unaided testimony nevertheless has a Fourth Amendment privilege against a more accurate version of the events in question.
>
> It is thus untenable to consider the activities and reports of the police agent himself, though acting without a warrant, to be a "reasonable" investigative effort and lawful under the Fourth Amendment but to view the same agent with a recorder or transmitter as conducting an "unreasonable" and unconstitutional search and seizure.

*White*, 401 U.S. at 752–753, 91 S.Ct. at 1126–1127 (citation omitted). I think that when

the Supreme Court, in a well-reasoned opinion, finds that police conduct does not violate the Fourth Amendment, this Court should adopt the U.S. Supreme Court's reasoning with regard to our own constitutional search and seizure provisions.

In sum, the majority's new rule essentially is devoid of significant legal support and sound reasoning. The rule is unnecessary to protect the law-abiding citizenry from arbitrary use of confidential informants by the police. It is also useless in protecting criminal suspects from arbitrary police conduct since police can use informants who are not armed with electronic surveillance devices to enter a suspect's home for the purpose of gathering incriminating evidence. Further, the new rule is at odds with the constitutional thinking of the United States Supreme Court, the United States Congress, the majority of states, and the precedent of this Court. Finally, and most troubling, is that the likely effect of the majority's new rule is to make legitimate police investigations of criminal suspects more time-consuming, complex, and difficult. For all of these reasons, I dissent.